[No. C063527. Third Dist. Nov. 7, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
TERRY JACK MATHSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II. of the Discussion.

COUNSEL

Alison E. Kaylor, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MURRAY, J.**—Defendant was convicted of driving under the influence of drugs. (Veh. Code, § 23152, subd. (a).)[1] He admitted an allegation that he had three or more prior driving-under-the-influence-related convictions within 10 years. (§ 23550.) Defendant was also convicted of driving while his license was suspended or revoked (§ 14601.5) and driving a vehicle that was not equipped with an ignition interlock device (§ 23247, subd. (e)).

Defendant took prescription Ambien while at home and fell asleep. He asserted that he was not criminally liable because he was sleep driving and, therefore, unconscious during the incident.

On appeal, defendant contends that the trial court's modified CALCRIM instructions to the jury on unconsciousness, voluntary intoxication, and involuntary intoxication were erroneous. Defendant also contends that the condition of probation imposed by the trial court that prohibits him from driving or having access to a vehicle or keys to a vehicle while he is taking Ambien violates his constitutional rights to travel, free association and privacy.

In the published portion of this opinion, we conclude that, except for the instruction on unconsciousness, the trial court's instructions were not erroneous. In our view, CALCRIM No. 3425 on unconsciousness is flawed, but the error is harmless in this case.

In the unpublished portion of this opinion, we conclude that one aspect of defendant's challenged probation condition is unconstitutionally overbroad and remand the matter to the trial court to address the defect.

Finding no other error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with four counts stemming from his conduct just before midnight on October 16, 2008: count one, felony driving under the influence (sometimes referred to herein as DUI) (§ 23152, subd. (a)), with three or more DUI-related convictions within the past 10 years (§ 23550); count two, being a habitual traffic offender (§ 14601.3); count three, driving with a suspended or revoked license (§ 14601.5, subd. (a)); and count four, driving a vehicle that was not equipped with a functioning ignition interlock device while his driving privilege was restricted (§ 23247, subd. (e)).

---

[1] Undesignated statutory references are to the Vehicle Code.

Based on the October 16, 2008 incident, the People filed a petition to revoke defendant's probation in a previous DUI case, and the Placer County Probation Department filed a separate petition to revoke defendant's probation in another DUI case.

### The Prosecution's Case

On October 16, 2008, as Jeremy Miller was driving home from work, he saw a car driving erratically, "splitting lanes," veering off the road onto the shoulder, and speeding up and slowing as it traveled east on Interstate 80. Miller called 911 and reported the erratic driving behavior. At the dispatcher's request, Miller followed the car to an ampm Mini Market, where he saw a man leave the car, enter the market, return to the car, and begin to pump gas. He provided the dispatcher with a description of the car and the man who was driving it.

Rocklin Police Officer Jeff Kolaskey responded, arriving at the market shortly after 11:45 p.m. Kolaskey saw a man matching the description Miller had provided standing between the gas pumps and a car that matched Miller's description. When Kolaskey asked defendant his name, instead of responding verbally, defendant pulled out his identification card and gave it to Kolaskey. Kolaskey testified that defendant responded coherently to a series of questions, including: where defendant was coming from, when and what he had last eaten, when he had last consumed alcohol or drugs, when and for how long he had last slept, whether his car had mechanical problems, whether he was diabetic or epileptic, whether he was under a doctor's care, and whether he was taking any medication.

Defendant was cooperative during Kolaskey's interview and responded to all of Kolaskey's questions. Defendant did not stare blankly at the officer or fail to respond to questions. Defendant did not say anything that indicated he was unaware he had been driving or that he was unaware of what he was saying or doing, and Kolaskey testified he had no reason to believe defendant was unaware of those things. On cross-examination, however, Kolaskey admitted testifying at the preliminary hearing that defendant appeared to be incoherent.

In response to the question about where defendant was going, defendant told Kolaskey that he drove from his house in Fair Oaks to get gas. Defendant actually lived in Citrus Heights. In response to the officer's questions about when and what defendant had last eaten, defendant said he had tortilla pizza at 1:00 p.m. that day. In response to the officer's questions about when defendant had last slept and for how long, defendant said he had slept for an hour earlier that day.

Defendant initially denied having consumed any alcohol or drugs but, upon further questioning, defendant told Kolaskey that he had taken two 5-milligram prescription Vicodin pills at his home earlier that day—the first at 9:00 a.m. and the second at 4:00 p.m. Defendant told Kolaskey that the Vicodin had been prescribed for a back problem. During the interview with Kolaskey, defendant never mentioned having taken Ambien or zolpidem.[2]

Kolaskey observed that defendant had droopy, watery and glassy eyes, slow, slurred speech and a dry mouth. Although defendant's verbal responses made sense to Kolaskey, defendant's words "would run together." Kolaskey also observed that defendant was swaying, and was uneasy standing on his own feet unassisted.

Kolaskey performed a series of field sobriety tests on defendant in the gas station parking lot.[3] Defendant appeared to understand Kolaskey's instruction for each test and also verbally stated that he understood each of the instructions after they were given. During the tests, defendant swayed, had difficulty maintaining his balance, exhibited a "very slow internal clock," was unable to accurately count, swayed when stationary and when he walked, walked in a "robotic manner," and was unable to touch his nose.

Kolaskey detected no odor of alcohol on defendant, but based on his observations, he concluded that defendant was under the influence of drugs. Kolaskey administered a preliminary alcohol screening test in the field with defendant's consent. The test indicated that defendant did not have alcohol in his system.

Kolaskey placed defendant under arrest for driving under the influence and transported him to the Placer County Jail. There, Kolaskey explained the blood-alcohol test options to defendant and defendant said he would take a blood test. Defendant's blood was drawn for testing at 1:40 a.m.

The blood test showed that defendant had 0.13 milligrams per liter of zolpidem in his system. No alcohol or other drugs were present.

The People's pharmacology expert, Dr. Julianna Landon Burton, testified that zolpidem, which is marketed under the brand name Ambien, among others, is prescribed as a sleep aid and can cause drowsiness, dizziness, confusion, poor motor coordination, and erratic and impulsive behavior.

---

[2] Ambien is the trade name of one of a number of sleep aids in which the main ingredient is the drug zolpidem. For the most part, we refer to the drug as Ambien.

[3] The field sobriety tests included the nystagmus test, the Romberg test, the walk-and-turn test (heel to toe), the one-leg stand test, the finger-to-nose test and a preliminary alcohol screening test.

According to Dr. Burton, when Ambien is first prescribed, pharmacists are legally required to counsel the patient about Ambien's side effects. A patient might also get a warning from his or her physician. Whenever Ambien is dispensed, it comes with label and package insert warnings that it can cause dizziness and drowsiness and cautions against operating heavy machinery and driving while using the drug. Patients are instructed to sit on their beds when they take Ambien and then to lie down. It is fast acting.

Dr. Burton opined that the symptoms Kolaskey observed in defendant and the driving behavior Miller reported are consistent with the effects Ambien can have on a user.

According to Dr. Burton, studies show that 1.6 hours after taking the maximum recommended dose of 10 milligrams, people have an average peak level of 0.12 milligrams per liter of Ambien in their blood. Dr. Burton opined that since defendant had been in custody between 11:45 p.m. (the time when Officer Kolaskey encountered defendant) and 1:40 a.m. (when his blood was drawn), he had to have taken more than the maximum recommended dosage of 10 milligrams of Ambien on October 16. It is not possible to tell how much more defendant took without knowing how long before 11:45 p.m. he ingested the drug.

Dr. Burton testified that sleep driving is a rare side effect of Ambien. In 2007 and 2008, the manufacturer of Ambien sent letters to health care professionals to warn them that Ambien can cause sleep driving. According to Dr. Burton, there had been a cumulative total of approximately 1,000 reported cases of sleep driving while under the influence of Ambien, and it is estimated that 26 million Ambien prescriptions are written per year. Dr. Burton stated that as of 2007, federal law requires that a warning relating to sleep driving as a possible side effect of Ambien be included in the written materials included in each prescription of Ambien. Dr. Burton testified that Ambien has also been associated with sleep walking, preparing food, eating, making phone calls and engaging in conversations and other behaviors a person does not typically engage in while asleep. Ambien has also been associated with amnesia.

## The Defense Case

Defendant testified that in October 2008, he worked in construction. At that time, he suffered from insomnia, a condition he had had "for a long time." Without medication, he usually could not sleep for two to three days. By October 2008, he had been taking Ambien for insomnia for six or seven years, under the care of his physician, Dr. Thomas Dolkas. Defendant's Ambien dosage had remained the same since 2002. Dr. Dolkas testified he

"prescribed a usual amount, one at night, 10 milligrams I believe it was." He acknowledged that the Physician's Desk Reference indicates a patient should not take more than 10 milligrams of Ambien in a 24-hour period. While Dr. Dolkas said he never told defendant he should not take more than one 10-milligram dose in a 24-hour period, a patient should not do so.

Defendant testified that he was prescribed "One 10 milligram dose. One pill at bedtime." He testified that he had never been told by a medical professional that he could not take more than one dose of Ambien within a 24-hour period, but he knew he should not.

Dr. Dolkas testified that he had never had a conversation with defendant about sleep driving or other complex behaviors associated with Ambien, such as making phone calls or preparing food while asleep.

Defendant testified he was aware of warnings that Ambien causes sedation, drowsiness, or dizziness. Defendant was also aware that Ambien use is associated with other complex behaviors such as sleep eating and having conversations with others while the user is asleep. In fact, defendant had made phone calls while he was asleep. He testified that, prior to October 16, 2008, he had called his mother, his ex-wife, and others on a few occasions and engaged in conversation while he was asleep. Defendant also thought he may have left his house and returned while sleeping one night. He had been told that a friend who came over to check on him because he had been making phone calls found his door open, but found him at home. Defendant was aware, from what he saw on television, that an Ambien user who experiences "complex behaviors" while asleep should consult a doctor. Defendant admitted he did not talk to a doctor about making telephone calls while asleep because, even though it was embarrassing, he was not concerned about these incidents. During an interview with his defense expert, Dr. Gregory Sokolov, defendant told Dr. Sokolov that the sleep conversations did not scare him that much. Defendant also did not report to his doctor the incident in which friends had become concerned about phone calls he made one night, after which they went to check on him and found his door had been left open.

As for sleep driving, defendant testified he had heard the warnings about sleep driving in relation to Ambien use on television "probably a couple years" before October 16.[4] Defendant was not concerned about sleep driving because he had been taking Ambien for many years and had never had a sleep-driving episode.

---

[4] At oral argument, defendant's appellate counsel stated that defendant heard the sleep-driving warnings on TV in 2000, eight years before his arrest. While defendant testified on direct examination that he heard the warnings in 2000, on cross-examination, he said it had been "probably a couple of years before" his arrest.

"A couple years before" his arrest is more consistent with the other evidence. As we have noted *ante*, federal law required that written warnings about sleep driving be provided in each

Defendant testified that on the evening of October 15, 2008, he took one Ambien pill at 10:00 p.m. or 11:00 p.m. The following morning, after defendant learned that he did not need to go to work that day, he took another Ambien pill around 7:00 a.m. He did not remember taking another Ambien pill afterward. However, he admitted that it is possible he took more Ambien pills on October 16 because he later discovered approximately four Ambien pills missing. Contrary to defendant's testimony, Dr. Sokolov testified that defendant told him seven or eight Ambien pills were missing.

Defendant testified that although he remembered a police officer standing in front of him, he did not remember driving to Rocklin, his conversation with the police officer, taking field sobriety tests, or being taken to the police station. According to defendant, the first thing he remembered after he took Ambien on the morning of October 16, 2008, was waking up in jail dressed in orange. In contrast, defendant told his psychiatric expert, Dr. Sokolov, that he remembered his blood draw, which took place before defendant "woke up" in jail.

Similar to the prosecution's expert, Dr. Sokolov testified that he recalled receiving a letter from the manufacturer of Ambien that had been sent to health care professionals warning about sleep driving. Dr. Sokolov opined that on October 16, 2008, defendant was in a state of sedative hypnotic intoxication as a result of taking Ambien. According to Dr. Sokolov, one is not fully aware and cannot process information in a conscious and rational manner when in a state of sedative hypnotic intoxication. Based on his understanding that defendant appeared confused and robotic to Officer Kolaskey, Miller's observation of defendant's erratic driving, defendant's inability to remember what happened on October 16 and defendant's prior episodes of having conversations while asleep, Dr. Sokolov opined that, "within a medical certainty," defendant was in a state of sedative hypnotic intoxication, known as "sleep driving," on October 16. Dr. Sokolov testified that Ambien affects the judgment center of the brain, but not ingrained memories of behaviors in which the Ambien user has previously repeatedly engaged, such as driving. Dr. Sokolov agreed, however, that responding intelligibly to specific questions by a police officer evidences a conscious act. He also agreed that indicating understanding of field sobriety test instructions is evidence of awareness. It is evidence that "at some level . . . there is processing of information, basic commands [to] do this [or do] that."

Dr. Sokolov testified that defendant told him he had no memory of taking the Ambien pills he was missing. According to Dr. Sokolov, taking more pills might be complex behavior caused by the Ambien. However, he cited no

prescription beginning in 2007. Ambien's manufacturer sent sleep-driving warnings to health care professionals in 2007 and 2008.

studies, articles or reports indicating that such behavior had been reported among the other reported complex behaviors.

Like Dr. Sokolov, defendant's pharmacology expert, Dr. Alan Donelson, testified that while under the influence of Ambien, a user is not fully conscious of what he or she is doing. It is "almost as if part of their brain is asleep and part of their brain is not." Dr. Donelson testified that Ambien has been associated with complex ambulatory behaviors, such as sleep driving, food preparation and sleep eating. There have been reports of people who have taken Ambien making uncharacteristic phone calls and having emotional but intelligible conversations with others while asleep.

According to Dr. Donelson, sleep driving has been "widely recognized as a problem." Dr. Donelson testified that a study revealed gross deviation from normal driving behaviors, such as failing to maintain lanes, running off the road, running up on sidewalks, and driving into objects. Upon getting out of a vehicle, the sleep driver will have the appearance of a grossly intoxicated person, slurring his or her words, looking half asleep, and swaying while standing. To the uneducated eye, the person appears to be drunk, rather than asleep. Dr. Donelson was not asked about one's ability to understand and perform field sobriety tests or the behaviors exhibited during such testing.

Dr. Donelson opined that the results of defendant's blood test and Kolaskey's and Miller's observations on October 16, 2008, are consistent with defendant being asleep while he was driving.

Dr. Donelson testified that Ambien metabolizes quickly. A person with severe insomnia who is worrying or anxious may not sleep through the night because the drug has its peak effect after only two hours. After four hours, the drug has worn off. "[I]t's not going to get you through the night if part of you wants to continue to worry and stay awake."

According to Dr. Donelson, the level of 0.13 milligrams per liter of zolpidem measured in defendant's blood draw at 1:40 a.m. would be within the therapeutic range provided the drug was ingested four hours before. But if a person were to have last taken Ambien 14 hours prior to the blood draw at 1:40 a.m. resulting in a level of 0.13 milligrams per liter, that person would have had to have taken a "huge dose." The dose would "probably" have been "close to a toxic level, four or five or six tablets." Unlike Dr. Sokolov, Dr. Donelson did not testify that taking more pills while asleep is a complex behavior caused by Ambien.

### The Verdicts and Probation Violation Findings

The jury found defendant guilty of driving under the influence as charged in count one of the complaint. Defendant waived his right to a jury trial on

the section 23550 allegation in count one and the misdemeanor offenses charged in count three, driving with a suspended license, and count four, driving a vehicle that was not equipped with an ignition interlock device. Defendant admitted the prior convictions alleged in count one. Pursuant to an apparent negotiated agreement, defendant stipulated to the facts needed to establish counts three and four, and count two, being a habitual traffic offender, was dismissed.[5] The trial court found defendant guilty on counts three and four and found defendant in violation of his probation in both probation cases based on defendant's conviction in this case.

## Sentencing

Defendant was granted formal probation for a period of five years and ordered to serve 180 days in jail with seven days' credit for the convictions in the present case. However, the trial court granted defendant's motion to stay the execution of his judgment and sentence pending this appeal.[6]

The trial court reinstated defendant's probation in his two prior driving-under-the-influence-related cases, ordered defendant to serve 60 days in one case and 19 days in the other, to run consecutively to each other and to the sentence in this case.

## DISCUSSION

### I. Jury Instructions

### A. In Limine Motions/Instruction Conference

Prior to trial, defendant filed an in limine motion in which he requested the standard jury instructions on unconsciousness and involuntary intoxication. Defendant argued that the trial court should give CALCRIM Nos. 3425,

---

[5] Defendant agreed to the stipulation on the condition that count two be dismissed and the trial court make a factual finding separate from the jury about whether defendant was voluntarily intoxicated at the time he committed counts three and four and for purposes of determining whether defendant was in violation of his probation. The trial court found that defendant was voluntarily intoxicated.

[6] It is not clear what the court intended to do here. Initially, the court indicated it would stay judgment and sentencing. Then the court indicated it was only going to stay the "jail portion" and fees and fines. Then the court asked defendant if he "wish[ed] to accept the terms and conditions of probation as outlined here with the understanding that the terms would be stayed?" Defendant answered "Yes." Then the court indicated it was staying the custody time pending appeal. It is also not clear whether the court intended the stay to include the custody time for the probation violations. The clerk's minute order, however, indicates that the "sentence" was stayed, and the minute order bears the case numbers for the present case and the two probation cases.

unconsciousness, and 3427, involuntary intoxication, so the jury could determine whether defendant knew or had reason to anticipate that taking prescription Ambien could cause sleep driving.

Thereafter, the prosecutor filed a motion to exclude evidence of unconsciousness on the grounds that voluntary intoxication is not a defense to driving under the influence, and involuntary intoxication is not at issue where defendant intentionally took Ambien after having engaged in ambulatory behavior while asleep on prior occasions.

Defendant subsequently filed an "adde[n]dum" to his in limine motion, requesting modified versions of CALCRIM Nos. 3425, unconsciousness[7] and 3427, involuntary intoxication.[8] Defendant argued that because sleep driving is such a bizarre consequence of taking Ambien, a person who previously had not experienced this side effect is not criminally responsible for sleep driving even if he had heard that Ambien could cause sleep driving. In defendant's view, a person taking Ambien should be held liable for driving under the influence only if he knew that taking Ambien would cause him to sleep drive.

## B. The Court's Instructions

The trial court reserved ruling on the instructions until the evidence was presented. Ultimately, the court rejected defendant's proposed instructions and gave its own modified CALCRIM instructions on unconsciousness and involuntary intoxication, as well as a modified CALCRIM instruction on voluntary intoxication. The trial court instructed the jury as follows:[9]

### 1. Unconsciousness (modified CALCRIM No. 3425)[10]

"The defendant is not guilty of driving under the influence if he acted while legally unconscious. Someone is legally unconscious when he is not

---

[7] See footnote 16, *post.*

[8] See footnote 29, *post.*

[9] Italics indicate modifications the trial court made to the standard CALCRIM instructions Nos. 3425, 3426 and 3427.

[10] The unmodified version of CALCRIM No. 3425 on unconsciousness (Apr. 2008 rev.) reads as follows:

"The defendant is not guilty of _____ <*insert crime[s]*> if (he/she) acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. [Someone may be unconscious even though able to move.]

"Unconsciousness may be caused by (a blackout[,]/[or] an epileptic seizure[,]/[or] involuntary intoxication[,]/[or] sleepwalking[,]/or _____ <*insert a similar condition*>).

"The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious. If, however, based on all the evidence, you have a reasonable doubt that (he/she) was conscious, you must find (him/her) not guilty."

conscious of his actions. *Unconsciousness need not rise to the level of coma or inability to walk or perform manual movements.* [¶] *Legal unconsciousness may be caused by involuntary intoxication. Legal unconsciousness may not be caused by voluntary intoxication.* The People must prove beyond a reasonable doubt that the defendant was legally conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was legally conscious. If, however, based on all of the evidence you have a reasonable doubt that he was legally conscious, you must find him not guilty."

2. *Voluntary intoxication (modified CALCRIM No. 3426)*[11]

"Voluntary intoxication is <u>not</u>[12] a defense to driving under the influence of drugs. *If you conclude that the defendant's state of intoxication was voluntary, then the defendant's state of consciousness or lack thereof shall not be considered as a defense to the crime.* [¶] A person is voluntarily intoxicated if, *one, the defendant willingly and knowingly ingested a substance, two, the substance was capable of producing an intoxicating event* [*sic*],[13] *and three . . . [t]he defendant knew the substance could produce an intoxicating effect.*" (Italics added.)

---

[11] The standard version of CALCRIM No. 3426 on voluntary intoxication is intended to relate to specific intent and mental state crimes. It reads as follows:

"You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted [or failed to do an act] with _____ *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .' or 'the intent to do the act required'>.*

"A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, *or willingly assuming the risk of that effect.*

"[Do not consider evidence of intoxication in deciding whether _____ *<insert non-target offense>* was a natural and probable consequence of _____ *<insert target offense>.*]

"In connection with the charge of _____ *<insert first charged offense requiring specific intent or mental state>* the People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with _____ *<insert specific intent or mental state required, e.g., 'the intent to permanently deprive the owner of his or her property' or 'knowledge that . . .'>.* If the People have not met this burden, you must find the defendant not guilty of _____ *<insert first charged offense requiring specific intent or mental state>.*

"*<Repeat this paragraph for each offense requiring specific intent or a specific mental state.>*

"You may not consider evidence of voluntary intoxication for any other purpose. [Voluntary intoxication is not a defense to _____ *<insert general intent offense[s]>.*]" (Some italics added.)

[12] The word "not" was underlined in the written instructions provided to the jury.

[13] The written copy of the instructions provided to the jury correctly contained the word "effect" instead of "event."

### 3. Involuntary intoxication (modified CALCRIM No. 3427)[14]

*"Involuntary intoxication is a defense to driving under the influence. If you conclude that the defendant's state of intoxication was involuntary, then the defendant's state of consciousness or lack thereof shall be considered pursuant to a separate instruction regarding unconsciousness as previously read. [¶] A person is involuntarily intoxicated if the defendant knowingly—excuse me—unknowingly[15] ingested an intoxicating substance, two, the defendant's intoxication was caused by force, duress, fraud, or trickery or [sic] someone else for whatever purpose without any fault on the part of the intoxicated person or, three, he either unknowingly ingested some intoxicating liquor or drug or other substance or if he voluntarily ingested a legally prescribed drug that caused him to act unconsciously without knowing or that he reasonably should have known of the drug's intoxicating effects. . . . [¶] . . . [¶] In determining whether intoxication by prescription drug is involuntary, consider whether the defendant knew or had reason to anticipate that his use of the prescription drug could cause such intoxicating effects."*

## C. Standard of Review

"A trial court must instruct the jury 'on the law applicable to each particular case.' [Citation.] '[E]ven in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.' [Citation.] Therefore, a claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo. [Citation.] In conducting this review, we first ascertain the relevant law and then 'determine the meaning of the instructions in this regard.' [Citation.] [¶] The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law . . . .' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]" ' [Citation.]

---

[14] The unmodified version of CALCRIM No. 3427 on involuntary intoxication (Jan. 2006 rev.) reads as follows:

"Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required (intent/[or] mental state) when (he/she) acted.

"A person is *involuntarily intoxicated* if he or she unknowingly ingested some intoxicating liquor, drug, or other substance, or if his or her intoxication is caused by the force, duress, fraud, or trickery of someone else, for whatever purpose[, without any fault on the part of the intoxicated person]." (Original italics.)

[15] In the written instructions provided to the jury, the word "unknowingly" is used, not "knowingly." Immediately after reading this paragraph, the trial court reminded the jurors that they would receive a written copy of the instruction. No objection was made at trial to the instructions as read and no oral correction was requested.

'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111–1112 [93 Cal.Rptr.2d 433].)

"The meaning of instructions is no[t] . . . determined under a strict test of whether a 'reasonable juror' *could* have understood the charge as the defendant asserts, but rather under the more tolerant test of whether there is a 'reasonable likelihood' that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276 [107 Cal.Rptr.2d 160] (*Dieguez*).)

## D. Applicable Law

■ "Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge. [Citations.] To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist 'where the subject physically acts but is not, at the time, conscious of acting.' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 417 [64 Cal.Rptr.3d 721, 165 P.3d 512]; see Pen. Code, § 26, class Four ["[p]ersons who committed the act charged without being conscious thereof" are not criminally responsible for that act].)

■ Voluntary intoxication includes the voluntary ingestion of any intoxicating drug. (Pen. Code, § 22, subd. (c).) While evidence of voluntary intoxication is admissible on the issue of whether or not a defendant actually formed a required specific intent or mental state (Pen. Code, § 22, subd. (b); *People v. Velez* (1985) 175 Cal.App.3d 785, 791 [221 Cal.Rptr. 631] (*Velez*)), voluntary intoxication "is not a defense to a general intent crime." (*Velez, supra*, 175 Cal.App.3d at p. 791.) In *Velez*, this court noted that the union or joint operation of act and intent that must exist in general intent crimes is deemed to exist irrespective of unconsciousness arising from voluntary intoxication. (*Ibid.*) "[C]riminal responsibility is justified on the theory that having chosen to breach one's duty to others of acting with reason and conscience, one may not entirely avoid criminal harm caused by one's breach of duty. It is therefore apparent the imposition of criminal responsibility for acts committed while voluntarily intoxicated is predicated on a theory of criminal negligence." (*Velez, supra*, at pp. 794–795.) Driving under the

influence is a general intent crime (§ 23152, subd. (a); *People v. Garcia* (1989) 214 Cal.App.3d Supp. 1, 5 [262 Cal.Rptr. 915] (*Garcia*)), and voluntary intoxication is not a defense (*People v. Chaffey* (1994) 25 Cal.App.4th 852, 855 [30 Cal.Rptr.2d 757] (*Chaffey*)).

■ In contrast, involuntary intoxication that results in unconsciousness is a complete defense to a crime. (*Velez, supra,* 175 Cal.App.3d at p. 793.) Involuntary intoxication can be caused by the voluntary ingestion of prescription medication if the person did not know or have reason to anticipate the drug's intoxicating effects. (*Chaffey, supra,* 25 Cal.App.4th at pp. 856–858.)

The question of whether intoxication is voluntary or involuntary focuses on whether the intoxication is induced through the defendant's fault or the fault of another or whether the defendant knows or has reason to anticipate the intoxicating effects of the substance he or she ingests. If intoxication is the result of the defendant's own fault or the defendant knows or has reason to anticipate the intoxicating effects, the intoxication is voluntary. (*Velez, supra,* 175 Cal.App.3d at p. 796; *Chaffey, supra,* 25 Cal.App.4th at pp. 856–858.)

There is a dearth of published California decisions on whether the voluntary and knowing ingestion of prescription medication constitutes voluntary or involuntary intoxication. In *Chaffey,* the defendant had been prescribed Xanax for anxiety and sleeplessness. She took an overdose in an effort to commit suicide. (*Chaffey, supra,* 25 Cal.App.4th at pp. 854–855.) The overdose rendered the defendant unconscious so that she had no awareness of what she was doing. The defendant drove her car and was arrested for driving under the influence. (*Id.* at pp. 853–854.) She had no recollection of what she did after taking the Xanax. (*Chaffey, supra,* 25 Cal.App.4th at p. 854.) Her psychiatrist testified that the defendant was unconscious when she was driving. (*Ibid.*)

Sitting as the trier of fact after the parties waived a jury trial, the trial court concluded that the intoxication must have been voluntary because it was predictable that the defendant would go through a period of sleepiness after taking an overdose of Xanax and that something would happen during that time. (*Chaffey, supra,* 25 Cal.App.4th at p. 854.) Accordingly, the trial court found defendant guilty of driving under the influence. (*Ibid.*) The appellate department of the trial court reversed the judgment based on the conclusion that the defendant was involuntarily intoxicated as a matter of law because, in

the appellate department's view, the undisputed facts established that the defendant did not know and a reasonable person in her condition would not have known that an overdose of Xanax would have caused intoxication. (*Id.* at pp. 854, 857.)

The Court of Appeal canvassed out-of-state cases involving intoxication from the use of prescription drugs. (*Chaffey, supra,* 25 Cal.App.4th at pp. 856–857.) These cases held that the intoxication is voluntary when the defendant knew or should have known of a drug's potential intoxicating effects. (*Ibid.*) The *Chaffey* court held that although a trier of fact could legitimately have found involuntary intoxication under the circumstances of that case, substantial evidence supported the trial court's finding of voluntary intoxication. (*Id.* at pp. 857–858.) In particular, the court noted that the defendant voluntarily swallowed the Xanax tablets, the label warned her that Xanax would cause drowsiness, and one should not operate heavy equipment when taking Xanax. (*Id.* at pp. 854, 857.) The court reasoned, "[i]t may be true that [the defendant] did not intend or even expect to be able to stand up let alone drive a car. Although such a specific event was not predictable or necessarily foreseeable from her past experience with Xanax, it is possible as the trial judge stated that she '. . . would go through a period of sleepiness and that something would happen in that period of time . . . .' " (*Id.* at p. 857.)

### E. Analysis

Defendant argues that the trial court's instructions on unconsciousness, voluntary intoxication, and involuntary intoxication were erroneous. We agree that the instruction on unconsciousness was flawed, but disagree that the other instructions were erroneous. We conclude that the flaws in the unconsciousness instruction are harmless.

### 1. *Instruction on legal unconsciousness*

Defendant contends that the trial court's instruction on unconsciousness is erroneous for two reasons. First, citing CALCRIM No. 3425, defendant contends that the trial court erred in declining to add "sleep driving" as a cause of unconsciousness. Second, defendant contends that the court's instruction directed the jury to ignore the expert testimony and to find defendant was not legally unconscious. We reject the first contention, but find some merit to the second.

#### a. *Cause of unconsciousness*

Defendant requested an instruction that states, in relevant part, "Unconsciousness may be caused by a blackout, an epileptic seizure, involuntary

intoxication, sleepwalking, *sleep driving or other similar condition.*" (Original italics.)[16] The trial court rejected defendant's proposed instruction and in its modification of CALCRIM No. 3425, the court omitted all recognized causes of legal unconsciousness other than involuntary intoxication. Defendant argues that the trial court improperly removed an element of causation by refusing to instruct on "the causation of [defendant's] mental state."

Defendant apparently equates his proposed insertion of "sleep driving" with the parenthetical reference to "sleep walking" or "other similar condition" in CALCRIM No. 3425. Defendant is mistaken, but the mistake is understandable given the CALCRIM reference to "sleep walking."

█ It is well settled that "[a]n unconscious act within the contemplation of the Penal Code is one committed by a person who because of *somnambulism,* a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional." (*People v. Sedeno* (1974) 10 Cal.3d 703, 717 [112 Cal.Rptr. 1, 518 P.2d 913], italics added, overruled on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 165 [77 Cal.Rptr.2d 870, 960 P.2d 1094], and disapproved on another ground in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; *People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1083 [124 Cal.Rptr.3d 182].) It appears that "sleep walking" was substituted in CALCRIM No. 3425 as a plain English substitute for what courts previously have referred to as "somnambulism."

In the context of legal unconsciousness, somnambulism[17] is a disorder or "condition" on a par with epilepsy, another recognized cause of legal

---

[16] The modified version of CALCRIM No. 3425 offered by defendant reads as follows:

"The defendant is not guilty of Driving Under the Influence, if he acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move.

"Unconsciousness may be caused by a blackout, an epileptic seizure, involuntary intoxication, sleepwalking, *sleep driving, or other similar condition.*

"The People must prove beyond a reasonable doubt that the defendant was conscious when he acted. If there is proof beyond a reasonable doubt that the defendant acted if he were conscious, you should conclude that he was conscious. If, however, based on all the evidence, you have a reasonable doubt that he was conscious, you must find him not guilty." (Original italics.)

[17] "Somnambulism" is no longer the term used by mental health professionals to describe the disorder. The current term of art is "Sleepwalking Disorder" and the diagnostic criteria can be found at section 307.46 of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000) (DSM-IV-TR). The disorder is distinct from the effects of intoxication. In fact, according to the DSM-IV-TR, "Sleepwalking Disorder should not be diagnosed if the behavior is due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition . . . ." (DSM-IV-TR, *supra,* § 307.46, Sleepwalking Disorder, p. 639.)

unconsciousness. (See *People v. Freeman* (1943) 61 Cal.App.2d 110, 115–116 [142 P.2d 435] [epilepsy is one of a number of causes of legal unconsciousness].) Neither the prosecution nor the defense experts here described sleep driving as a disorder or a "condition." Rather, it is a behavior that might result from the intoxicating effect of Ambien. In other words, defendant's purported unconsciousness was not caused by sleep driving. Instead, sleep driving is purportedly what defendant did while legally unconscious.

The trial court's modified instruction, which stated that unconsciousness may be caused by involuntary intoxication, is a correct statement of the law (*Velez, supra,* 175 Cal.App.3d at p. 793), and the Judicial Council did not contemplate that each recognized cause of legal unconsciousness be listed for every jury. The recognized causes are set forth as options within parentheses. This, of course, indicates that the trial court is to select only the potential cause supported by the evidence. (See 1 CALCRIM (2012) Guide for Using Judicial Council of Cal. Crim. Jury Instns. (CALCRIM) Alternatives vs. Options, p. xxvi ["[w]hen the user must choose one of two or more options in order to complete the instruction, the choice of necessary alternatives is presented in parentheses . . ."].) This is appropriate since listing causes not supported by the evidence could be potentially confusing for the jury.

Defendant's proposed modification sets forth a list of several alternative causes of legal unconsciousness—sleep driving being one alternative. But the insertion of the phrase "sleep driving," in addition to the inclusion of involuntary intoxication as a cause of legal unconsciousness, would have made the instruction read as if legal unconsciousness could result from involuntary intoxication *or* sleep driving (or one of the other listed conditions). Such an instruction would have effectively blurred the distinction between voluntary intoxication resulting in sleep driving, which is not excusable, and involuntary intoxication resulting in sleep driving, which is excusable.[18] For this reason and the additional reason that sleep driving is not

---

[18] We note that there are no published cases that suggest sleep walking *causes* unconsciousness. To avoid confusion in the future, it is recommended that the Judicial Council consider substituting "sleep walking" with "somnambulism" or the current term of art, "Sleepwalking Disorder." It seems likely that in any case where the defense contends that somnambulism or Sleepwalking Disorder has caused legal unconsciousness, there will be expert testimony describing the disorder and the symptomatic behaviors. Thus, the jury will be informed about the disorder and there will be no need to assign a plain English label to it.

We also note that only one case is cited in the Authority section following CALCRIM No. 3425, in the bullet entitled, "Unconscious State: Somnambulism or Delirium." That case is *People v. Methever* (1901) 132 Cal. 326, 329 [64 P. 481], overruled on other grounds in *People v. Gorshen* (1953) 51 Cal.2d 716 [336 P.2d 492]). But *Methever* did not involve somnambulism or sleep walking. (*Methever, supra,* 132 Cal. at p. 328.) The defendant in *Methever* pled insanity and also asserted unconsciousness, claiming that he had previously suffered serious head injuries and also that he had an attack of delirium tremens at the time of the crime. (*Ibid.*)

a disorder or condition that causes legal intoxication, the trial court did not err by refusing to insert sleep driving as an alternative cause of legal unconsciousness.

### b. *Presumption of consciousness*

Consistent with CALCRIM No. 3425 and the proposed modified instruction submitted by defendant, the court instructed the jury: "The People must prove beyond a reasonable doubt that the defendant was legally conscious when he acted. *If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was legally conscious.* If, however, based on all of the evidence you have a reasonable doubt that he was legally conscious, *you must* find him not guilty." (Italics added.)

While defendant offered the same language in his proposed modification to CALCRIM No. 3425,[19] he now objects to that instruction on appeal. Defendant contends that the italicized language directed the jury to ignore the expert testimony that indicated a person can perform learned, complex behaviors after ingesting Ambien and appear to be awake, when in fact, the person is not awake. Defendant asserts that the instruction told the jury to conclude defendant was conscious without considering this expert testimony. Defendant further contends that the challenged instruction lightens the prosecution's burden of proof in violation of his constitutional rights to a jury trial and due process. While we disagree that the instruction violates defendant's due process rights, we agree that the instruction is potentially confusing and should be modified. However, as we discuss *post*, the error here is harmless.

Before discussing the flaws we see in the challenged instruction, we first review the history of the instruction and the legal rule it is intended to address—the presumption of consciousness.

The genesis of the instruction is *People v. Hardy* (1948) 33 Cal.2d 52 [198 P.2d 865] (*Hardy*). (See commentary to CALCRIM No. 3425, *supra*, at p. 1023.) In *Hardy*, our high court discussed the judicially created presumption that a person who acts conscious is conscious. (*Hardy, supra*, 33 Cal.2d at p. 63.) The trial court in *Hardy* instructed the jury: " 'When the evidence shows that a defendant acted as if he was conscious, the law presumes that he then was conscious. This presumption is disputable, but is controlling on the question of consciousness until overcome by a preponderance of the evidence, which means such evidence as when weighed against the presumption, and any evidence supporting the presumption has more convincing force, and

---

[19] See footnote 16, *ante*.

from which it results that the greater probability of truth lies therein.' " (*Ibid.*) Our high court observed, "There is no *statutory* presumption that a man is conscious merely because he acted as if he were conscious. [Citations.] Such a presumption, however, appears to have been recognized by judicial decision. (See *People* v. *Nihell*, 144 Cal. 200, 202 [77 P. 916].)·But there can be no justification in the law for placing on the defendant the burden of overcoming the presumption 'by a preponderance of the evidence.' " (*Hardy, supra*, 33 Cal.2d at p. 63.) The court reasoned that, "[t]he necessary effect" of the trial court's instruction "was to place on [the] defendant not merely the burden of producing evidence which would raise a reasonable doubt as to her consciousness, but the much greater burden of proving unconsciousness by a preponderance of the evidence." (*Id.* at p. 64.)

The *Hardy* court went on to note that the presumption serves only to require the defendant to produce sufficient evidence to raise a reasonable doubt in the minds of the jury. (*Hardy, supra*, 33 Cal.2d at p. 64.) One reason for this rebuttable presumption "is that [the cause of unconsciousness] relates to defendant personally and lies peculiarly within his knowledge, and hence for reasons of convenience and necessity he should have the burden of producing evidence thereon." (*Ibid.*) This presumption does not change the prosecution's burden to prove the charged offense beyond a reasonable doubt, however. (*Ibid.*) A defendant can overcome the presumption regarding consciousness by simply producing sufficient evidence to raise a reasonable doubt that he or she was conscious when he or she acted during the commission of the alleged crime. (*Ibid.*)

In *People v. Williams* (1971) 22 Cal.App.3d 34 [99 Cal.Rptr. 103] (*Williams*), the defendant contended at trial he was in the throes of a psychomotor epileptic attack that rendered him unconscious when he shot and killed a complete stranger. (*Williams, supra*, 22 Cal.App.3d at p. 38.) The trial court instructed the jury on unconsciousness, using the pre-1972 version of CALJIC No. 4.31.[20] (22 Cal.App.3d at p. 55.) As defendant here points out, the *Williams* court concluded that the instruction was incompatible with the testimony of the expert witnesses. The experts had testified that, to an outward observer, a person in a psychomotor seizure acts purposefully and normally, as if he were conscious. The court observed that the jurors probably viewed the instruction as directing that they find the defendant conscious because of his conscious-like conduct regardless of the expert testimony. (*Williams, supra*, 22 Cal.App.3d at pp. 55–57.) Thus, the court held that the

---

[20] We shall refer to this version of CALJIC No. 4.31 as the pre-1972 version. The pre-1972 version of CALJIC No. 4.31 read: " 'If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he was conscious, you should find that he was conscious. [¶] However, if the evidence raises a reasonable doubt that he was in fact conscious, you should find that he was then unconscious.' " (*Williams, supra*, 22 Cal.App.3d at p. 55.)

pre-1972 version of CALJIC No. 4.31 required the jury, as a rule of law, to find the defendant conscious instead of simply giving consideration to a rebuttable presumption. (22 Cal.App.3d at p. 57.)[21]

In *People v. Maxey* (1972) 28 Cal.App.3d 190, 200 [104 Cal.Rptr. 466] (*Maxey*), the court observed, "[t]he first [sentence in the pre-1972 version of CALJIC No. 4.31], *standing alone*, would require the jury to find a defendant conscious, if they were convinced beyond a reasonable doubt that he acted *as if he were conscious*. Thus, the jury would be precluded from finding a defendant unconscious in a case where his *overt acts* were those of a conscious person and regardless of any expert testimony or other evidence of unconsciousness. The second [sentence] of the instruction, however, properly concludes that '. . . if the evidence raises a reasonable doubt that he was in fact conscious, you should find [that] he was unconscious.' Although the second [sentence] is somewhat saving, we nevertheless agree with the court in *Williams* . . . that the first [sentence] is misleading and that the total instruction is confusing, at the very least."

In *People v. Cruz* (1978) 83 Cal.App.3d 308 [147 Cal.Rptr. 740] (*Cruz*), the Court of Appeal observed that CALJIC No. 4.31 was modified in 1972 to address the concern about expert witness testimony expressed in *Williams* and *Maxey*. (*Cruz, supra*, 83 Cal.App.3d at p. 331.) The 1972 revision added the following italicized language to the instruction: " 'However, if, *notwithstanding the defendant's appearance of consciousness*, the evidence raises a reasonable doubt whether he was in fact conscious, you should find that he was then unconscious.' "[22] (83 Cal.App.3d at p. 331, italics added.) The court in *Cruz* suggested that the instruction as revised still created confusion and held that the italicized language did not cure the problem. The court reasoned, "No. 4.31 does not adequately instruct the jury of the operation of the

---

[21] The problem with the instruction was exacerbated by a procedural nuance in *Williams*. In addition to a not guilty plea, the defendant also entered a plea of not guilty by reason of insanity. In the guilt phase, the defendant asserted diminished capacity and unconsciousness as defenses. In instructing on the guilt phase, the trial court told the jury that the defendant " 'shall be conclusively presumed to have been sane' " at the time of the offense. (*Williams, supra*, 22 Cal.App.3d at p. 51, italics omitted.) The *Williams* court held that given the instruction explaining the two phases of the trial and advising that defendant was to be conclusively presumed sane in the first phase, the trial court should have clarified the jury's role in determining unconsciousness (and diminished capacity). (*Id.* at p. 53.) Against this backdrop, the court held, "in the structure of this particular case, the trial court erred in giving CALJIC No. 4.31." (*Id.* at p. 55.)

[22] The 1972 revision of CALJIC No. 4.31 read: " 'If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he was conscious, you should find that he was conscious. [¶] However, if, *notwithstanding the defendant's appearance of consciousness*, the evidence raises a reasonable doubt whether he was in fact conscious, you should find that he was then unconscious.' " (*Cruz, supra*, 83 Cal.App.3d at p. 331, italics added.)

rebuttable presumption as it relates to reasonable doubt on the issue of acts that demonstrate consciousness. The addition of the phrase 'notwithstanding the defendant's appearance of consciousness' does not cure this defect." (*Cruz, supra*, 83 Cal.App.3d at p. 332.)

*Williams* and *Cruz* were discussed in *People v. Kitt* (1978) 83 Cal.App.3d 834 [148 Cal.Rptr. 447] (*Kitt*), disapproved on another ground in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865]. Disagreeing with *Cruz*, the court in *Kitt* held that the 1972 revision to CALJIC No. 4.31 cured the defect identified in *Williams*. (*Kitt, supra*, 83 Cal.App.3d at pp. 842–843.) Noting that *Williams* rejected the earlier version of CALJIC No. 4.31 as a conclusive presumption of consciousness following from the fact that a defendant acted in a conscious manner, the court in *Kitt* observed, "[t]he second paragraph of CALJIC No. 4.31, as revised in 1972, sets forth the method of operation of [the rebuttable] presumption. It does so properly without using the term '*presumption*.' We find nothing confusing or contradictory in the instruction." (*Kitt, supra*, 83 Cal.App.3d at p. 842; see *People v. Caldwell* (1980) 102 Cal.App.3d 461, 478–479 [162 Cal.Rptr. 397] (*Caldwell*) [agreeing with *Kitt* that the 1972 revision cured the problem identified in *Williams*].)

While the defect noted in *Williams* was corrected, the court in *Kitt* found fault with the second sentence of the 1972 revision of CALJIC No. 4.31: " 'However, if, notwithstanding the defendant's appearance of consciousness, the evidence raises a reasonable doubt whether he was in fact conscious, you *should* find that he was then unconscious.' " (*Kitt, supra*, 83 Cal.App.3d at p. 841, italics added.) The court took exception with the use of the word "should" and suggested it be substituted with the word "must." "The use of the word 'should' might well be understood by the jury as *not* requiring it to make a finding of unconsciousness under the circumstances of reasonable doubt."[23] (*Kitt, supra*, 83 Cal.App.3d at p. 843.) *Kitt*'s recommendation was followed in the 1979 revision of CALJIC No. 4.31.[24] (*Caldwell, supra*, 102 Cal.App.3d at pp. 478–479.)

---

[23] Defendant points out *Kitt*'s criticism on this issue, but distorts *Kitt*'s focus. The 1972 revision of CALJIC No. 4.31 used the word "should" twice. Defendant focuses on the use of the word "should" in the preceding sentence: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he was conscious, you *should* find that he was conscious." The court in *Kitt* did not find that part of the instruction to be defective, and neither do we.

[24] The 1979 version of CALJIC No. 4.31 read: " 'If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged offense the defendant acted as if he were conscious, you should find that he was conscious, *unless from all the evidence you have a reasonable doubt that he was in fact conscious at the time of the alleged offense.* [¶] If the evidence raises a reasonable doubt that he was in fact conscious, you must find that he was then unconscious.' " (*Caldwell, supra*, 102 Cal.App.3d at p. 479, fn. 4, italics added.)

In *People v. Babbitt* (1988) 45 Cal.3d 660, 690–696 [248 Cal.Rptr. 69, 755 P.2d 253] (*Babbitt*), the Supreme Court upheld the 1979 revision of CALJIC No. 4.31. The 1979 revision is the immediate predecessor to the CALCRIM instruction challenged in the instant case. In *Babbitt*, the defendant was charged with, inter alia, murder and attempted rape. One of the theories advanced by the defense was unconsciousness stemming from a psychomotor epileptic seizure. (45 Cal.3d at pp. 676, 678–679.) The defendant argued that because unconsciousness negates the element of intent, proof of consciousness is a fact necessary to prove intent. Thus, the presumption of consciousness created in CALJIC No. 4.31 impermissibly lightened the prosecutor's burden of proving intent, or stated conversely, impermissibly shifted the burden of negating intent to the defendant. (45 Cal.3d at p. 691.)

■ Rejecting that argument, our high court held that unconsciousness is a defense, not an element of murder or any other crime. (*Babbitt, supra,* 45 Cal.3d at p. 693.) The court explained, "Although the state, once the defendant raises the issue, has assumed the burden of disproving unconsciousness, this fact of itself does not transform absence of the defense—consciousness—into an element of murder for purposes of due process analysis. This is true even though unconsciousness negates the elements of voluntariness and intent, and when not voluntarily induced is a complete defense to a criminal charge. [Citations.]" (*Ibid.*) "[B]ecause consciousness is not an element of the offense of murder (nor of any offense), CALJIC No. 4.31 does not impermissibly shift to the defendant the burden of negating an element, nor does the instruction violate due process by impermissibly lightening the prosecution's burden of proving every element beyond a reasonable doubt. Consequently, there is no constitutional impediment to the state's use of a rebuttable presumption in meeting its assumed burden—once the issue has been raised—to prove consciousness beyond a reasonable doubt." (*Babbitt, supra,* at pp. 693–694.)

The Supreme Court reasoned that CALJIC No. 4.31 did not require the defendant to persuade the jury that he was unconscious. (*Babbitt, supra,* 45 Cal.3d at p. 695, fn. 15.) The instruction merely required the defendant to "raise a reasonable doubt that he was conscious, and then only if the prosecution's proof did not of itself raise such a doubt." (*Id.* at pp. 694, 695, fn. 15.)

Our high court further reasoned that CALJIC No. 4.31 must be read together with the other instructions the trial court gave to the jury (*Babbitt, supra,* 45 Cal.4th at p. 695), noting that the jury was instructed on the presumption of innocence, the prosecution's burden of proving every element of the charged offenses beyond a reasonable doubt, the sufficiency of circumstantial evidence to prove specific intent or mental state, that unconsciousness was a complete defense, and that if there was reasonable doubt

that the defendant was conscious, the defendant must be acquitted (*id.* at pp. 695–696). "Placed in context, therefore, CALJIC No. 4.31 did little more than guide the jury as to how to evaluate evidence bearing on the defendant's consciousness and apply it to the issue, an issue that is capable of proof only by circumstantial evidence of the defendant's conduct." (*Id.* at p. 696.) Thus, the court concluded, "given the entirety of the charge a reasonable juror could not have believed that defendant was required to persuade it that he was unconscious. Rather, the instructions taken as a whole clearly indicate the prosecution had the burden of proving beyond a reasonable doubt not only that defendant appeared to be conscious, but also that he in fact was conscious." (*Ibid.*)

Thus, the *Babbitt* court approved of the manner in which the presumption of consciousness was handled in the 1979 revision of CALJIC No. 4.31.[25] (*Babbitt, supra,* 45 Cal.3d at pp. 693–694.) Here, the jury was instructed in the language of the third paragraph in CALCRIM No. 3425. That paragraph reads in part: "If there is proof beyond a reasonable doubt that the defendant acted as if he were conscious, you should conclude that he was legally conscious. *If however,* based on *all* of the evidence you have a reasonable doubt that he was legally conscious, *you must find him not guilty.*" (Italics added.) That part of the instruction is similar to the 1979 revision of CALJIC No. 4.31 in two respects, but its language is also different in two ways that could be potentially confusing.

We note first that the instruction improves on the prior CALJIC iterations. The two sentences of the third paragraph in CALCRIM No. 3425 referenced above are preceded by: "The People must prove beyond a reasonable doubt that the defendant was legally conscious when he acted." This emphasis was not in any of the CALJIC instructions, and it positively reinforces both the burden of proof and the fact that the prosecution bears that burden.

Looking now to the two similarities, we note that the instruction is different from the instruction criticized in *Williams* and somewhat consistent with the 1972 and 1979 revisions of CALJIC No. 4.31 discussed in *Babbitt.* CALCRIM No. 3425 tells the jury to consider *all* of the evidence when deciding whether there is a reasonable doubt that the defendant was conscious. Also, the word "must" is used as suggested by the court in *Kitt.*

---

[25] As defendant noted, the Judicial Council included citations to *Kitt* and *Cruz* in the commentary to CALCRIM No. 3425. (Commentary to CALCRIM No. 3425, *supra,* at p. 1023.) However, contrary to defendant's assertion, these cases are not cited in the commentary because of the concern expressed in *Williams* regarding the compatibility of the instruction with expert witness testimony. The Judicial Council included these cases in the commentary to explain why it declined to specifically reference the presumption of consciousness in CALCRIM No. 3425 (commentary to CALCRIM No. 3425, *supra,* at p. 1023), consistent with *Kitt* and the approved instruction in *Babbitt.* We agree with that approach.

Nevertheless, the wording of the second sentence in the third paragraph of CALCRIM No. 3425 is problematic in two ways. First, in our view, it bears greater similarity to the pre-1972 version of CALJIC No. 4.31 criticized in *Williams* and *Maxey* than the 1979 revision approved in *Babbitt*. In the 1979 revision, the direction that the jury should find the defendant conscious if he "acted as if he were conscious" is expressly qualified by language that immediately follows in the same sentence: *"unless* from all the evidence you have a reasonable doubt that he was in fact conscious." In CALCRIM No. 3425, the critical language is located in a separate sentence, disconnected from the direction ("should conclude") that precedes it. So the jury is first told it should conclude defendant was conscious if he "acted as if he were conscious." That command is not expressly qualified by an "unless" clause but is instead followed by a separate sentence that begins, "If, however." "If, however" is *not* the same as "unless." In context, it could mean that the jury is only to consider whether there is reasonable doubt based on the other evidence if it finds that a defendant acted as if he was not conscious. The instruction is unnecessarily ambiguous.

■ Second, instead of telling the jurors they must find the defendant unconscious if they have a reasonable doubt that the defendant was conscious, the final sentence directs the jurors to find the defendant *not guilty*. As we have discussed, in an intoxication case, a defendant who was unconscious must be found not guilty only if the intoxication was involuntary. A defendant who was unconscious may still be found guilty if the intoxication was voluntary. Because the last sentence compels the jury to reach a not guilty verdict instead of compelling a finding regarding unconsciousness, that sentence is potentially confusing.

We have one other observation about the trial court's modified version of CALCRIM No. 3425. In our view, the trial court's modification to the second paragraph in CALCRIM No. 3425 makes the instruction superior to the current version in the context of an intoxication defense case. In explaining the law of unconsciousness, the trial court explained that while involuntary intoxication can cause legal unconsciousness, voluntary intoxication cannot. This additional language served to enhance the jury's understanding of the law and focused the jury's attention on the predicate to the application of the instruction on unconsciousness—Was defendant's intoxication voluntary or involuntary?[26]

---

[26] To avoid the ambiguity and the potential confusion we have discussed and to incorporate the trial court's improvement to the unconsciousness instruction for intoxication defense cases, we recommend that CALCRIM No. 3425 be revised to read:

"The defendant is not guilty of _____ *<insert crime[s]>* if (he/she) acted while legally unconscious. Someone is legally unconscious when (he/she) is not conscious of (his/her) actions. [Someone may be unconscious even though able to move.]

"[Legal unconsciousness may be caused by (a blackout[,]/ [or] an epileptic seizure[,]/[or] sleepwalking disorder[,]/ or _____ *<insert a similar condition>*)].

## 2. *Instruction on voluntary intoxication*

The trial court instructed the jury that voluntary intoxication is not a defense to driving under the influence, and if the jury concluded that defendant's state of intoxication was voluntary, defendant's state of consciousness or lack thereof should not be considered a defense to driving under the influence. Defendant contends that these instructions impermissibly relieved the prosecution of the burden of proving "the element of 'mental state,' specifically knowledge." Defendant asserts that even if the jury found voluntary intoxication, it could still have found that defendant's "condition" negated his knowledge that Ambien could cause "intoxicating effects, or ambulatory effects such as sleep driving." Defendant further argues that the trial court had a sua sponte duty to instruct on the union of act and mental state pursuant to CALCRIM No. 251, union of act and intent: specific intent or mental state.[27] He contends that knowledge is a necessary mental state in this case. We disagree.

 To prove that defendant was guilty of driving under the influence, the prosecution did not have to prove a knowledge element. The prosecution had to prove that (1) defendant drove a vehicle and (2) defendant was under the influence of an alcoholic beverage or drug or under the combined influence of an alcoholic beverage and drug when he drove the vehicle. (§ 23152, subd. (a).) As we have previously noted, driving under the influence is a general intent crime (§ 23152, subd. (a); *Garcia, supra,* 214 Cal.App.3d at p. Supp. 5) and voluntary intoxication is not a defense to a charge of driving under the influence (*Chaffey, supra,* 25 Cal.App.4th at pp. 854–855, 857–858).

---

"[Legal unconsciousness may be caused by involuntary intoxication. Legal unconsciousness cannot be caused by voluntary intoxication.]

"The People must prove beyond a reasonable doubt that the defendant was conscious during the commission of the offense(s). If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) was conscious during the commission of the alleged offense(s), you should conclude (he/she) was conscious, unless from all of the evidence you have a reasonable doubt that (he/she) was conscious. If, based on all of the evidence you have a reasonable doubt that (he/she) was conscious, you must find that (he/she) was unconscious."

[27] CALCRIM No. 251 reads:

"The crime[s] [(and/or) other allegation[s]] charged in this case require proof of the union, or joint operation, of act and wrongful intent.

"For you to find a person guilty of the crime[s] (in this case/ of _____
*<insert name[s] of alleged offense[s] and count[s], e.g., burglary, as charged in Count 1>* [or to find the *allegation[s]* of _____ *<insert name[s] of* enhancement[s]> true]), that person must not only intentionally commit the prohibited act [or intentionally fail to do the required act], but must do so with a specific (intent/ [and/or] mental state). The act and the specific (intent/ [and/or] mental state) required are explained in the instruction for that crime [or allegation]."

█ CALCRIM No. 251 derives from Penal Code section 20, which provides: "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." This statute relates to the mens rea elements of offenses and links the mens rea element to the actus reus element. Penal Code section 20 does not apply to defenses.

Defendant misplaces reliance on *People v. Alvarez* (1996) 14 Cal.4th 155, 220 [58 Cal.Rptr.2d 385, 926 P.2d 365] to make his point. In discussing CALJIC No. 3.31, the former pattern instruction on the rule in Penal Code section 20, our high court stated, "[b]y its very terms, this instruction applies only to 'crimes' . . . ." (*Alvarez, supra*, 14 Cal.4th at p. 221.)

█ As we have already explained, unconsciousness is a defense; consciousness is not an element of a crime. (*Babbitt, supra*, 45 Cal.3d at p. 693.) Consistent with *Babbitt* and Penal Code section 20, we hold that the question of whether defendant knew of Ambien's intoxicating effects—a question that goes to the issue of whether his intoxication was voluntary or involuntary, and thus relevant to the defense of unconsciousness—is not an element of the crime. Thus, it would have been inappropriate to instruct the jury on the joint operation of act and the mental state of knowledge.

Because driving under the influence is a general intent crime, the trial court gave a modified version of CALCRIM No. 250, union of act and intent: general intent. The trial court told the jury that to find defendant guilty of driving under the influence, the jury must find that defendant committed the prohibited act, and that defendant intentionally did the wrongful act; however, there is no requirement that defendant intended to break the law. In the modified portion of the instruction, the court expressly referred the jury to the instructions relating to unconsciousness, voluntary intoxication, and involuntary intoxication for the specific rules as they relate to the general intent required in the case. This instruction was appropriate. Indeed, like the court's modification of the unconsciousness instruction, the modification to CALCRIM No. 250 enhanced the jury's comprehension of the law and focused the jury on the central issue in the case.

The trial court also instructed the jury it could find defendant was voluntarily intoxicated if it found defendant willingly and knowingly ingested an intoxicating substance when he knew the substance could produce an intoxicating effect. (Pen. Code, § 22, subd. (c); *Chaffey, supra*, 25 Cal.App.4th

at pp. 856–858.) While this modified instruction was not completely congruent with the modified instruction on involuntary intoxication,[28] this instruction, combined with the instruction on involuntary intoxication and the instruction that the prosecution had to prove its case beyond a reasonable doubt, adequately stated the required factual findings for voluntary intoxication and the prosecution's burden of proof.

3. *Instruction on involuntary intoxication*

Defendant contends that the trial court erred by refusing to instruct the jury it had to find defendant was involuntarily intoxicated if it determined defendant did not know or have reason to know that Ambien would specifically cause him, as opposed to consumers in general, to sleep drive.[29] Defendant theorizes a person is involuntarily intoxicated when he or she previously experienced one intoxicating effect from prescription medication (such as engaging in sleep conversation), knew that use of that substance could cause sleep driving, but had not previously experienced a sleep-driving episode. Essentially, defendant asserts that until a person actually has a sleep-driving experience, intoxication resulting in sleep driving is involuntary. We equate this to a rule that would provide Ambien users one free sleep-driving episode before they could be held criminally culpable, even though they knew the drug has caused sleep driving by others. Defendant does not cite any authority in support of this proposition.

As we have noted, this court explained in *Velez* that criminal responsibility in a general intent crime is justified where a defendant is voluntarily intoxicated to the point of unconsciousness even though there was no actual intent to commit a crime because a defendant may not avoid the criminal harm caused by his or her failure to act "with reason and conscience." (*Velez, supra,* 175 Cal.App.3d at p. 794.) Criminal responsibility in this context is predicated on a theory of criminal negligence. (*Ibid.*) Thus, this court applied an objective test in *Velez* to determine whether a defendant was voluntarily intoxicated: whether a reasonable person in the defendant's

---

[28] See footnote 31, *post.*

[29] Defendant requested the following modified version of CALCRIM No. 3427, involuntary intoxication:

"Consider any evidence that the defendant was involuntarily intoxicated in deciding whether the defendant had the required intent or mental state when he acted.

"A person is *involuntarily intoxicated* if he either unknowingly ingested some intoxicating liquor, drug, or other substance *OR if he voluntarily ingested a legally prescribed drug that caused him to act unconsciously.*

"*The intoxication by a medication taken as prescribed is not voluntary just because the person knows that the medication can cause symptoms in some people. For the intoxication to be voluntary, he must know or should have known that the medication would specifically cause him to sleep drive, sleep walk, or cause another symptom.*" (Original italics.)

circumstances could have anticipated the intoxicating effects of the substance he had consumed. (*Id.* at pp. 794–796.) And, as we have noted, *Chaffey* held that a finding of voluntary intoxication was proper even though the specific event of sleep driving was not foreseeable from the defendant's past experience with prescription Xanax. (*Chaffey, supra,* 25 Cal.App.4th at p. 857.) Defendant's one free sleep-driving episode theory is inconsistent with *Velez* and *Chaffey.*

The jury here was instructed that a person is involuntarily intoxicated if he voluntarily ingested a legally prescribed drug that caused him to act unconsciously, "without knowing or that he reasonably should have known of the drug's intoxicating effects." The trial court further instructed, "In determining whether intoxication by prescription drug is involuntary, consider whether the defendant knew or had reason to anticipate that his use of the prescription drug could cause such intoxicating effects." These instructions adequately stated the law on unconsciousness and involuntary intoxication. (*Velez, supra,* 175 Cal.App.3d at p. 796; *Chaffey, supra,* 25 Cal.App.4th at pp. 856–858.)[30] The instruction essentially told the jury that if it found defendant knew or had reason to know that his use of Ambien could cause sleep driving, then defendant's condition was not caused by involuntary intoxication.[31] On the

---

[30] We do not necessarily endorse the wording of the trial court's instruction on involuntary intoxication. We see no reason to include theories of how a person can become involuntarily intoxicated when there is no evidence suggesting those theories might apply (e.g., the defendant unknowingly ingested an intoxicating liquor or drug or other substance or the defendant's intoxication was caused by force, duress, fraud, or trickery of someone else). Consistent with the approach taken on the parenthetical options in CALCRIM No. 3425, we recommend that the Judicial Council consider putting the various theories in CALCRIM No. 3427 in parentheses, to be included only when supported by the evidence.

In a prescription drug case such as this, it perhaps would have been less distracting and more simply stated to tell the jury: "Involuntary intoxication is a defense to driving under the influence. A person is involuntarily intoxicated if he or she willingly and knowingly ingested a prescribed drug and did not know or reasonably could not have known of the drug's intoxicating effects." Thus stated, there would have been no need for the last sentence in the trial court's modified instruction. We recommend that the Judicial Council adopt such an instruction to be used in prescription drug cases where it is alleged the defendant willingly and knowingly took the prescription drug.

[31] We note that the trial court's instruction on voluntary intoxication does not mirror the instruction on involuntary intoxication. The voluntary intoxication instruction told the jury that defendant was voluntarily intoxicated if he knew of the intoxicating effects. The involuntary intoxication instruction told the jury that defendant was involuntarily intoxicated if he took the drug "without knowing *or that he reasonably should have known of the drug's intoxicating effects.*" Logically then, a person who does not know, but reasonably should have known of the intoxicating effects is voluntarily intoxicated. Yet, this was not expressly stated in the voluntary intoxication instruction.

Here, it would have been appropriate if the third element in the court's voluntary intoxication instruction read: "And three, the defendant knew *or reasonably should have known the substance could produce an intoxicating effect.*" Defendant does not assign the

other hand, if the jury found defendant did not know and could not have reasonably known that his use of Ambien could cause sleep driving, the jury was informed that defendant's intoxication would have been involuntary and the resulting unconsciousness would have been a complete defense to driving under the influence.[32]

## 4. *Harmless Error*

As we have indicated, the flaws we have identified in CALCRIM No. 3425 were harmless in this case.

In our harmless error analysis, we first focus on the evidence that establishes defendant was voluntarily intoxicated, because if he was, as defendant appropriately conceded at oral argument, the flaw in the unconsciousness

court's failure to include "reasonably should have known" language in the voluntary intoxication instruction as error, and we conclude the trial court's failure to include this mirror image language in the voluntary intoxication instruction was harmless. The instructions as a whole were adequate. "There is no error in a trial court's failing . . . to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial. As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error. The failure to give an instruction on an essential issue, or the giving of erroneous instructions, may be cured if the essential material is covered by other correct instructions properly given." (*Dieguez, supra*, 89 Cal.App.4th at p. 277.)

[32] We note that CALCRIM No. 3426, voluntary intoxication, states two ways a person can be voluntarily intoxicated—"knowing that [the drug] could produce an intoxicating effect, *or willingly assuming the risk of that effect*." (Italics added.) We take no position here about the assumption of the risk language as an alternative to actual knowledge of the intoxicating effects in cases not involving prescription drug intoxication. Although the genesis of that language is hard to pinpoint (see CALJIC No. 4.22 (1970 rev.) (3d ed. 1946), citing Fricke & Alarcon, Cal. Criminal Law (9th ed. 1970) p. 80), the language was long ago approved (*People v. Wyatt* (1972) 22 Cal.App.3d 671, 677 [99 Cal.Rptr. 674] [citing the same language in CALJIC No. 4.22 with approval, and citing 1 Witkin, Cal. Crimes (1963) § 146, p. 140, which cites CALJIC No. 78-D (1958) p. 75], as authority; see also 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 34, p. 365 [citing only the CALJIC instruction]). However, where the defendant asserts a defense based on the unexpected effect of prescription drugs, we are of the view that the assumption of the risk language does not adequately focus the jury on the question of foreseeability.

We recommend that the Judicial Council adopt the following instruction for voluntary intoxication to be used in cases where the defense involves a claim of unconsciousness resulting from the unexpected effect of prescription drugs: "Voluntary intoxication is not a defense to driving under the influence of drugs. If you conclude the defendant's intoxication was voluntary, then the defendant's unconsciousness resulting from that intoxication is not a defense to the crime. [¶] A person is voluntarily intoxicated if: (1) the person willingly and knowingly ingested a drug; (2) the drug was capable of producing an intoxicating effect and (3) the person knew or reasonably should have known that the drug could produce an intoxicating effect."

instruction is of no consequence. Thus, having concluded the voluntary and involuntary intoxication instructions were adequate, we look to the evidence that establishes defendant knew or should have known the Ambien he voluntarily took causes sleep driving.

Dr. Burton testified that each prescription of Ambien must include a written warning that Ambien can cause sleep driving. Dr. Donelson called sleep driving a "widely recognized" problem. Defendant did not claim actual ignorance of Ambien's intoxicating effects. To the contrary, defendant admitted that, prior to his arrest, he was aware of warnings that Ambien can cause sleep driving and other complex behaviors while the user is asleep. Defendant knew that prior to his arrest he had engaged in "complex behaviors" while asleep on multiple occasions. Although defendant knew from what he saw on television that he should consult a doctor if he experienced "complex behaviors" while asleep and using Ambien, he chose not to consult his doctor. Defendant knew or should have known that Ambien causes sleep driving, even though he had not previously personally experienced a sleep-driving episode after using Ambien. (*Chaffey, supra,* 25 Cal.App.4th at p. 857.)

There was evidence that defendant actually took more than the maximum prescribed dosage. By his own testimony, he took at least one more pill than was prescribed in a 24-hour period. Furthermore, tablets were purportedly "missing." Defendant testified four pills were missing, but he told Dr. Sokolov that seven or eight were missing. Based on the amount of zolpidem in defendant's system at the time of his arrest, Dr. Burton opined that defendant had taken more than the maximum prescribed dosage. And if defendant last took Ambien at the earlier time he claimed, Dr. Donelson opined that defendant would have taken a "huge dose," probably close to a toxic level—as many as four to six tablets. And defendant knew he should not take more than one tablet in a 24-hour period, even though his doctor did not tell him this.

Not only was there evidence defendant took more than the recommended maximum dosage, but there was also evidence that he attempted to conceal having taken Ambien by telling the officer he had taken prescription Vicodin at two specific times on that day—once in the morning and again in the afternoon—while never mentioning he had taken any Ambien at all. A consciousness of guilt can be inferred from this concealment.

The evidence overwhelmingly establishes defendant knew or should have known that the Ambien he took could have caused sleep driving, even though he had not previously personally experienced a sleep-driving episode after

using Ambien. Thus, defendant was voluntarily intoxicated, and the unconsciousness instruction does not apply.

Even if the unconsciousness instruction did apply, the flaw in the instruction is nonetheless harmless in this case. "If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*People v. Smithey* (1999) 20 Cal.4th 936, 963 [86 Cal.Rptr.2d 243, 978 P.2d 1171] (*Smithey*).) On review, the instructions must be examined as a whole, in light of the trial record. (*People v. Paysinger* (2009) 174 Cal.App.4th 26, 30 [93 Cal.Rptr.3d 901] (*Paysinger*) [court determined it was not "reasonably likely the jury understood the challenged instruction in a way that undermined the presumption of innocence or tended to relieve the prosecution of the burden to prove defendant's guilt beyond a reasonable doubt"]; see *Dieguez, supra*, 89 Cal.App.4th at p. 276.)

Our examination of the trial record includes consideration of the arguments of counsel. (See *People v. Garceau* (1993) 6 Cal.4th 140, 189 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Similar to our harmless error analysis, the thrust of the prosecutor's argument was that defendant's intoxication was voluntary and, as a consequence, the jury need not reach the issue of defendant's consciousness. The prosecutor told the jury, "The first question you have to ask yourself is after you establish he was under the influence, was the intoxication voluntary or was it involuntary, because that makes all the difference in this case." He later told the jury, "Voluntary intoxication is not a defense to driving under the influence of a drug. If you conclude that the defendant's state of intoxication was voluntary, then the defendant's state of consciousness shall not be considered. . . . If you find voluntary, do not consider consciousness, and the outcome is guilty. That's where the law is." The prosecutor later made the point again. "The intoxication is voluntary. The result is you cannot consider his state of consciousness in this case, and he's responsible for his own actions regardless of his state of consciousness. . . . That's what the law is, and, if you apply it, the defendant is guilty of this crime."

The prosecutor mentioned the unconsciousness instruction, but only to say, "This is the instruction that you cannot use unless you find that the . . . intoxication was involuntary. . . . You can't even get here unless you find involuntary intoxication."

In discussing unconsciousness, the prosecutor never suggested the jury was compelled to conclude defendant was conscious because he acted as if he was

conscious. The closest the prosecutor came to such an argument was when he argued that having amnesia does not equate to unconsciousness. In that context, the prosecutor said, "If they were [*sic*] unconscious, they [*sic*] would not be able to have an interaction with the officer." At no time did the prosecutor refer to the suspect language in the unconsciousness instruction. The prosecutor closed with, "So that's basically it. We're back to here. This is how you have to look at it. The defendant was voluntarily intoxicated, and he's responsible for his actions. That's what this case is about." There is simply no reason to suspect the jury relied on the instruction, let alone used it to disregard the expert opinion, given the prosecutor's argument that defendant's state of consciousness was not a critical factor in determining guilt.

Lastly, we examine the instructions as a whole. " ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " ' " (*Smithey, supra*, 20 Cal.4th at p. 963.) In addition to instructing the jury on unconsciousness, voluntary intoxication, and involuntary intoxication, the trial court instructed the jury that it may not convict defendant unless the prosecution proved defendant's guilt beyond a reasonable doubt, that the prosecution must prove beyond a reasonable doubt that defendant was conscious when he acted, that the jury must consider all of the evidence, and that if two or more reasonable conclusions could be drawn from circumstantial evidence—one pointing to guilt and the other pointing to innocence—the jury must accept the one pointing to innocence. The jury was also instructed on the manner in which it must evaluate expert and other witness testimony. The instruction used here, although flawed, did reference the requirement that the jury consider *all* of the evidence when determining whether there was a reasonable doubt defendant was conscious when he drove.

Given the entirety of the instructions, the trial evidence and the arguments of counsel, it was not *reasonably likely* the jury could have believed it was required to find defendant was conscious without considering all of the evidence presented, including the expert testimony, or that defendant bore the burden of persuading the jury that he was unconscious while driving. (*Paysinger, supra*, 174 Cal.App.4th at p. 30; *Dieguez, supra*, 89 Cal.App.4th at p. 276.) Accordingly, the error occasioned by the flaw in CALCRIM No. 3425 was harmless.

## II. Probation Conditions[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1297.

## DISPOSITION

The trial court is directed to modify the probation condition that prohibits defendant from having access to a vehicle or keys to a vehicle while he is taking Ambien. In all other respects, the judgment is affirmed.

Raye, P. J., and Butz, J., concurred.