Filed 2/28/14  P. v. Jennings CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RANDAL DOUGLAS JENNINGS,<br><br>        Defendant and Appellant. | A136736<br><br>(Mendocino County<br>Super. Ct. No. SCTM-CRCR-11-17899-02) |

## I.  INTRODUCTION

On May 27, 2011, defendant drove recklessly on State Highway 1 (hereafter Highway 1) just north of Fort Bragg and hit two cars, injuring four adults.  His defense at trial, which the jury rejected, was unconsciousness due to somnambulism.  On appeal, defendant contends the trial court gave erroneous instructions on unconsciousness, voluntary intoxication, and credibility that were individually and cumulatively prejudicial.  We affirm.

## II.  STATEMENT OF THE CASE

The Mendocino County District Attorney charged defendant with two counts of felony reckless driving causing specific injury and four counts of misdemeanor reckless driving with injury.  (Veh. Code, §§ 23105, 23104.)  A jury returned guilty verdicts on all counts.  At sentencing, the court placed defendant on probation for five years on the condition, among others, that he serve 360 days in the county jail.

III. STATEMENT OF FACTS

**A. *The Prosecution Case***

On May 27, 2011, Awyn Dobbs was driving northbound on Highway 1, near Cleone, California, when she saw a car tailgating her. The driver crossed over the double-yellow line twice while speeding past her. A short while later, she went around a curve and came upon the tailgating car in an accident with two other vehicles in the middle of the road.

Donald Godbey was driving northbound on the same highway and noticed a Lexus SUV behind him traveling very fast. The Lexus tailgated Godbey and then passed him on the left lane, turning the blind curve ahead "at a super high rate of speed." Three-quarters of a mile later, Godbey saw the SUV was in an accident with other cars. Godbey stopped to assist the injured. He spoke with defendant, the driver of the SUV, who "looked like he had smashed his head pretty hard." Defendant was mumbling incoherently but did say at one point that he was in an argument with his girlfriend. Megan Brazil, a passenger in Godbey's car, said the SUV was in the wrong lane when it passed them to go around a blind turn very fast.

Teresa Ketron was driving southbound on Highway 1 when the Lexus came towards her, straddling the yellow lines. It was swerving and its wheels struck the embankment. In her rear view mirror, Ketron saw the Lexus slam into the car behind hers. She called 911.

Keith Kaarup, Jr., his wife Lorae, and their three-year-old son Luca, were vacationing in Fort Bragg for the weekend with the Lintz family. Each family was driving southbound to dinner its own car. Lorae was in the front passenger seat and Luca was in the backseat on the passenger side in a car seat. Keith saw the Lexus as it was trying to get off the embankment on the northbound side of the road. After pulling off the embankment and getting back on the road, the Lexus surged forward and hit the Kaarups' car. The entire Kaarup family had to be transported to the hospital. Keith had neck and back injuries and a concussion. Lorae had two broken ribs and bruising to her chest. She is receiving counseling for posttraumatic stress disorder. Both adults had

2

knee injuries. Their son suffered no physical injuries other than bruising from his car seat, but he continued to experience night terrors for months after the accident.

The Lintzes' car was behind the Kaarups' car. Dan Lintz described the "[v]ery fast" speed of the Lexus and how it drove "straight head on" into the Kaarups' car. There was an explosion from the impact and parts of the cars flew into the air. The impact pushed the Kaarups' car off the side of the road and spun the Lexus around, causing the Lexus to hit the back of the Kaarups' car. The Lexus then hit the Lintzes' car. Dan Lintz was able to brake to a stop before the impact. His shoulder was sore for a few days after the accident. His wife had a torn rotator cuff and their two-year-old daughter suffered emotional trauma.

California Highway Patrol Officer Juan Inguanzo talked to defendant at the hospital. Defendant told him he remembered leaving a friend's home on Turner Road, putting on his seat belt, and driving northbound on Highway 1. The next thing he recalled was being in a helicopter on his way to a hospital. Inguanzo tested defendant but found he was not under the influence of alcohol. Defendant had abrasions consistent with using a seat belt.

California Highway Patrol Officers Robert Oates and Glen Thomas went to the scene of the accident on Highway 1 near Little Valley Road in response to 911 calls received around 7:00 p.m. The speed limit on this part of the highway is 45 miles per hour, but at this intersection there is a cautionary roadway sign with a posted speed limit of 35 miles per hour. The accident occurred at a blind turn. A sketch of the area showed the Lexus's path of travel was up on an embankment, back to the roadway, and then into the oncoming cars of the victims. Defendant was found to be at fault.

The accident occurred near Turner Road. A person travelling from Turner Road to the scene of the accident, as defendant claimed he did, would have passed through the towns of Fort Bragg and Cleone with several stop lights along the way.

**B.** *The Defense Case*

The defense case included the testimony of Dr. Richard Miller, a clinical psychologist. When Miller interviewed him, defendant recalled he drove his car but had

3

no memory of what happened just prior to or during the accident, and only some recollection of the time after the accident. He said he started driving home from Oregon with his girlfriend and their baby at 3:00 a.m. on the day of the collision. He took his prescription dose of methadone at the outset of the trip. Defendant said he was stressed and tired during the journey.

Defendant also told Miller he had been prescribed OxyContin, hydrocodone and methadone for pain management after surgery. Defendant tested positive for methadone after the accident. According to Miller, "there is . . . credible appearing research indicating that a significant percentage of patients taking methadone experience . . . somnambulism, or on the street sleepwalking." The doctor described sleepwalking as behaving without being conscious of your behavior. A significant percentage of people who sleepwalk have no memory of it. Besides common acts such as walking in one's home, and getting up during the night, sleepwalking can include driving unconsciously.

During the initial interview with Dr. Miller, defendant could not recall any prior incidents of sleepwalking. However, during trial, defendant met with Dr. Miller again and, in this interview, recalled one prior incident in which he was involved in a single car accident. He did not recall the actual collision but did remember the police on the scene afterwards; he was not cited for being under the influence of anything. He also recalled an occurrence when he got up from bed, made food on the stove and returned to bed. The food burned on the stove and the house filled with smoke. Someone found him asleep.

Dr. Miller saw a pattern in defendant's behavior and a correlation not amounting to cause and effect between methadone users and somnambulism. He noted one study in which 66 to 67 percent of people between the ages of 31 and 40 who took methadone reported experiencing an incident or more of somnambulism. Defendant was 42 at the time of the accident. Nevertheless, in Dr. Miller's opinion his age was "just too close to the target group . . . to invalidate the possibility that he's part of that."

Dr. Miller was of the opinion that defendant lost consciousness, most likely caused by somnambulism, while he was driving the car on the day of the collision. He considered this an "altered state of consciousness" in which the person is acting in less

4

than his or her full capacity. "There's a diminishment of their capacity to act because if they were acting in their full capacity they at least would turn the burner off or open a window."

On cross-examination, Dr. Miller stated he had between 5 and 12 patients who sleepwalk. They are less than 1 percent of his patients. A recent study indicates only 3 of 869 methadone patients experienced sleepwalking. The study did not conclude methadone causes sleepwalking. Dr. Miller agreed that methadone could have been a factor in the accident without triggering sleepwalking. He also agreed that a concussion could cause loss of consciousness and memory. Defendant's medical history indicated he regularly took methadone and OxyContin. The doctor agreed that taking those substances can contribute to difficulty driving, apart from sleepwalking. Defendant told hospital staff on the day of the accident that he sometimes crushed whatever pills he had on hand and injected them. Intravenous drug use could also affect one's driving ability.

Dr. Miller did not know if a person can go directly from a conscious state to a sleepwalking state, but he believed it was possible. In this respect he disagreed with the view expressed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders—Fourth Edition (DSM) commonly used as a diagnostic tool by psychologists and psychiatrists. According to the DSM, one goes from deliberate sleep to sleepwalking, but not from consciousness to sleepwalking.

Defendant testified on his own behalf. He began using prescription drugs for the management of constant back pain three years before he had back surgery in June 2010. He admitted he abused some of them. Prior to surgery, he sometimes crushed the pills and snorted and intravenously injected them. During the six months before the collision on May 27, 2011, defendant was making trips to St. Helena to visit his girlfriend at a hospital there; on one of those trips he dozed off and sideswiped a utility pole. He was not sleepwalking; he remembers everything prior to that accident. During that same six-month period, defendant experienced several episodes of waking up to food burning on the stove, one incident of driving to Safeway while sleepwalking, and one incident of doing several loads of laundry while sleepwalking.

On the day of the charged accident, he drove himself, his girlfriend and their baby from Oregon to his home in Fort Bragg, California. At that time, he was taking 60 milligrams of methadone a day, 30 milligrams in the morning and 30 milligrams at night. Methadone did not produce euphoria like some of the other narcotic pain medications he had taken prior to or right after surgery. On the day of the accident, he took his prescribed dosage around 5:00 or 6:00 a.m.

After he got home, a friend called and asked him to pick up some groceries. After dropping off the groceries, he pointed the car north intending to drive home and sleep. He had no real memory of driving home. He did not recall buckling his seat belt. The next thing he remembered was waking up in the hospital. Defendant fractured his clavicle and sustained bumps and bruises in the accident, but he was not aware of any head injuries. He supposed he was knocked unconscious in the accident. He denied telling a nurse he ground up whatever pills he could find and injected them in his veins; he did tell her that in the past he had abused Oxycodone in that way.

## C. *Rebuttal*

Dr. Mark Kline, a psychiatrist, testified for the prosecution as an expert on sleepwalking and sleep disorders. Sleepwalking usually begins in childhood and is unlikely to first occur in adulthood. Sleep takes place in four stages, from light to deep. Classically, sleepwalking occurs during deep sleep, the third and fourth stages; one has to sleep through stages one and two to get there. By definition, one is asleep first and then sleepwalks. He did not think people can go from an awake state to a sleepwalking state. People who sleepwalk are able to do some things, such as walk and open refrigerator doors, but sleepwalking "is not a normal waking state and people's psychomotor abilities . . . are pretty limited in a sleepwalking state." It would be extremely unlikely for a person to navigate curves and traffic conditions while sleepwalking. Both methadone and OxyContin can impair one's ability to drive safely; however, taking the drug regularly lessens the impairment compared with taking the drug for the first time. Methadone and OxyContin do not cause sleepwalking, but any sedative medication can increase the likelihood of a sleepwalking event in a susceptible person. Significantly,

according to Dr. Kline, the ability to operate a vehicle at high speed on a highway with traffic and curves in a sleepwalking state would be "zero." The most likely cause of a memory loss after an accident would be a concussion with retrograde amnesia.

## D. *Surrebuttal*

Dr. Miller disagreed with Dr. Kline's opinion that one could not go far if driving while asleep. He knew of cases where a person was driving a car and then began to sleepwalk.

## IV. DISCUSSION

The defense at trial was unconsciousness due to somnambulism, i.e., sleepwalking. At the defendant's request and over the prosecution's objection, the court gave a modified version of CALCRIM No. 3425. At the prosecutor's request and over defense objection, the court gave a modified version of CALCRIM No. 3426, on the relevance of voluntary intoxication to unconsciousness. The court did not instruct on involuntary intoxication leading to unconsciousness, which would have provided another complete defense to reckless driving.

Defendant challenges the correctness of the court's instructions on unconsciousness (CALCRIM No. 3425) and voluntary intoxication (CALCRIM No. 3426) as ambiguous and/or misleading on various points. We review these challenges in light of well-settled principles. "We conduct independent review of issues pertaining to instructions." (*People v. Cooksey* (2002) 95 Cal.App.4th 1407, 1411, citing *People v. Waidla* (2000) 22 Cal.4th 690, 733, 737.) When the defendant challenges the adequacy of the instruction as ambiguous or potentially misleading, our principle task is to determine " ' " ' "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution' " ' " or California law. (*People v. Ayala* (2000) 24 Cal.4th 243, 289; *Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Clair* (1992) 2 Cal.4th 629, 662–663.) We determine the correctness of the challenged instruction "in the context of the instructions as a whole and the trial record," and not " 'in artificial isolation.' " (*Estelle v. McGuire,* at p. 72; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) Thus, for example, " ' "[t]he absence of an essential

7

element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*Musselwhite*, at p. 1248.)

A trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct, it must do so correctly. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134 (*Mendoza*), citing *People v. Castillo* (1997) 16 Cal.4th 1009, 1014–1015.) We reverse only if we also find a reasonable probability the error affected the verdict adversely to defendant. (*Mendoza*, at pp. 1134–1135; *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 187.)

## A. *CALCRIM No. 3425—Unconsciousness*

Defendant argues CALCRIM No. 3425 misstates the prosecution's burden of proof because the CALCRIM instruction substitutes the words "If, however" for the word "unless" used in CALJIC No. 4.31.

CALCRIM No. 3425 as given in this case states: "The defendant is not guilty of reckless driving if [he] acted while legally unconscious. Someone is legally unconscious when he or she is not conscious of his or her actions. Someone may be unconscious even though able to move. [¶] Unconsciousness may be caused by sleepwalking. [¶] The People must prove beyond a reasonable doubt that the defendant was conscious when [he] acted. If there is proof beyond a reasonable doubt that the defendant acted as if [he] were conscious, you should conclude that [he] was conscious. *If, however, based on all the evidence,* you have a reasonable doubt that [he] was conscious, you must find [him] not guilty." (Italics added.)

CALJIC No. 4.31 states: "If the evidence establishes beyond a reasonable doubt that at the time of the commission of the alleged crime the defendant acted as if [he] [she] were conscious, you should find that [he] [she] was conscious, *unless from all the evidence* you have a reasonable doubt that the defendant was in fact conscious at the time of the alleged crime. [¶] If the evidence raises a reasonable doubt that the defendant was in fact conscious, you must find that [he] [she] was then unconscious." (Italics added.)

In *People v. Babbit* (1988) 45 Cal.3d 660 (*Babbit*), the California Supreme Court approved the wording of CALJIC No. 4.31 against a challenge that the instruction

"impermissibly shift[ed] to the defendant the burden of negating an element," and "violate[d] due process by impermissibly lightening the prosecution's burden of proving every element beyond a reasonable doubt." (*Babbit*, at pp. 693–694.) *Babbit* did not specifically discuss the "unless" clause.

In *People v. Mathson* (2012) 210 Cal.App.4th 1297 (*Mathson*), the Court of Appeal compared CALCRIM's "If, however" formulation with CALJIC's "unless" clause and found the former's wording "unnecessarily ambiguous." (*Mathson*, at p. 1323.) The court recommended that CALCRIM No. 3425 be modified. (*Id.* at pp. 1317, 1323, fn. 26.) Nevertheless, the *Mathson* court concluded the flaw in the instruction was harmless in that case because, "[g]iven the entirety of the instructions, the trial evidence and the arguments of counsel, it was not *reasonably likely* the jury could have believed it was required to find defendant was conscious without considering all of the evidence presented, including the expert testimony, or that defendant bore the burden of persuading the jury that he was unconscious while driving." (*Id.* at p. 1331.)

Defendant adopts the *Mathson* court's criticism here and argues that "because it fails to track the version of the instruction on this subject that has been approved by the supreme court, [CALCRIM No. 3425] erroneously misstates the prosecution's burden of proof," apparently because "it encouraged the jury to analyze only whether [defendant] 'acted like' he was conscious, and to never reach the dispute between the experts" as to whether defendant's driving maneuvers were consistent with unconsciousness.

We note the drafters of CALCRIM No. 3425 cite both *Babbitt* and *Mathson* with approval in the Bench Notes to the August 2013 revision of the instruction, and have modified CALCRIM No. 3425 to include the "unless" formulation favored by *Mathson*. (Judicial Council of Cal., Jury Instns. (Aug. 2013 Suppl.) Bench Notes to CALCRIM No. 3425, pp. 149–150.)

In our view, "If, however" obviously modifies the previous sentence and is not ambiguous. Nevertheless, even assuming the prior version of CALCRIM No. 3425 was "problematic" (*Mathson, supra*, 210 Cal.App.4th at p. 1323), we cannot find it prejudicial in this case. The entire trial was dominated by the experts' dueling opinions on whether

9

defendant could have been sleep-driving unconsciously when he executed reckless driving maneuvers that caused him to crash into two other cars on Highway 1.  In our view, it is not reasonably likely the jury would have ignored this evidence because of the phraseology of the instruction.

**B.  *CALCRIM No. 3426—Voluntary Intoxication***

With respect to voluntary intoxication and its relevance to unconsciousness, the trial court instructed the jury as follows.  "A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drugs, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] Unconsciousness caused by voluntary intoxication is not a defense to reckless driving."

Defendant challenges the voluntary intoxication instruction on two grounds: (1) the evidence adduced at trial did not support criminal liability based on the theory that defendant became voluntarily intoxicated after taking his prescription dose of methadone; and (2) the "assumption of risk" language in the challenged instruction misstates the prosecution's burden of proof by permitting the jury to find voluntary intoxication based on personal disapproval of methadone, or on strict liability, rather than on what defendant knew or should have known.  We disagree.

 "An unconscious act within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional." (*People v. Sedeno* (1974) 10 Cal.3d 703, 717, overruled on other points in *People v. Blakeley* (2000) 23 Cal.4th 82, 89 & *People v. Breverman* (1998) 19 Cal.4th 142, 163; see also *People v. Chaffey* (1994) 25 Cal.App.4th 852, 856; *People v. Boyes* (1983) 149 Cal.App.3d 812, 819.)  Unconsciousness, if *involuntarily* induced, is a complete defense to a criminal charge pursuant to Penal Code section 26, class Four.  (*People v. Kelly* (1973) 10 Cal.3d 565, 573; *People v. Cruz* (1978) 83 Cal.App.3d 308, 330; *People v. Halvorsen* (2007) 42 Cal.4th 379, 417.)

10

However, unconsciousness caused by *voluntary* intoxication is not an absolute defense to a general intent crime. (*People v. Cameron* (1994) 30 Cal.App.4th 591, 599–600; *People v. Chaffey, supra,* 25 Cal.App.4th at p. 855; *People v. Velez* (1985) 175 Cal.App.3d 785, 793–794.) Under Penal Code former section 22 (renumbered § 29.4), "[n]o action committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition" (*id.*, subd. (a)), although evidence of voluntary intoxication is admissible on the question of whether or not the defendant *actually* formed the required specific intent or premeditated, deliberated, or harbored malice aforethought when charged with murder (*id.*, subd. (b)). Voluntary intoxication includes the voluntary ingestion of "any intoxicating liquor, drug, or other substance." (*Id.*, subd. (c).) In combination, CALCRIM Nos. 3425 and 3426, as modified by the trial court, correctly reflected these principles.

### 1. *Substantial Evidence for Instruction*

Defendant argues there was no substantial evidence to support instruction on voluntary intoxication as a theory of criminal liability. "A party is not entitled to an instruction on a theory for which there is no supporting evidence." (*People v. Memro* (1995) 11 Cal.4th 786, 868.) Evidence is substantial if "a reasonable jury could find [it] persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.) The evidence need only be sufficient to support an inference (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145), so long as that inference is not speculative (*People v. Waidla*, *supra,* 22 Cal.4th at p. 735).

Here, the trial evidence showed that defendant took a prescription medication, methadone, in the early morning hours on the day of the accident, and then drove from Oregon to Fort Bragg, California after only a few hours of sleep. He had a chronic pain condition for which he had been taking methadone regularly since surgery in 2010, and he sometimes mixed methadone with other prescription pain relievers, which he had been taking for over three years.

According to hospital records, defendant tested positive for methadone, and he admitted to a nurse crushing whatever pills he had available and injecting them.

11

Although defendant claimed he had been misunderstood, and only admitted injecting OxyContin in the past, the jury was entitled to conclude from the evidence he injected OxyContin on the day of the accident. Expert testimony established that taking any sedative medication can increase the likelihood of sleepwalking in a susceptible person, and that taking methadone and OxyContin could contribute to bad driving, apart from sleepwalking, as could intravenous drug use. In our view, this was evidence from which a rational jury could have concluded that defendant may have been driving while unconscious, but if so, his unconsciousness was triggered by his voluntary ingestion of methadone and OxyContin. During the summation of the case, defense counsel apparently abandoned the argument that methadone ingestion caused defendant to sleepwalk, arguing instead that "[t]he predominant factor in [defendant's] driving behavior is fatigue." Nevertheless, the bell had been rung, and an instruction on the relationship between drug intoxication and unconsciousness was warranted.

Defendant also argues the evidence was not substantial because there was no evidence from which the jury could have inferred he knew or should have known that ingesting methadone could cause sleepwalking. It is true there was no evidence here of prior warnings about sleepwalking while taking the prescription drug as there was in *People v. Chaffey* (Xanax) or *Mathson* (Ambien). However, defendant testified he had previously experienced episodes of cooking and driving while asleep, and there was evidence suggesting defendant had abused methadone and/or other prescription drugs that day, notwithstanding his denial. The evidence presented at trial gave rise to a nonspeculative inference that defendant should have known from his past experience that mixing methadone and OxyContin or other prescription pain medication could induce sleep and precipitate sleepwalking in him. On this point, there was ample evidence. Testimony by the prosecution's expert, if believed, established that falling asleep was a prerequisite to sleepwalking, and that sedatives increase the likelihood of sleepwalking in a susceptible person. In recounting several episodes of cooking and doing laundry while sleeping, and two of driving while asleep, defendant portrayed himself as such a susceptible person. Furthermore, the jury could infer from defendant's longtime use of

12

OxyContin and methadone that he knew or should have known how those drugs affected him while driving. In our view, the evidence supported an instruction on the interplay between voluntary intoxication and unconsciousness. There was no error.

## 2. *"Assumption of Risk" Language*

In this court, defendant also challenges the following italicized "assumption of risk" language in the instruction, although he did not specifically object to it below. "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drugs, drink, or other substance knowing that it could produce an intoxicating effect, or *willingly assuming the risk of that effect*." (Italics added.) We do not find waiver, however, for defendant objected to the instruction as a whole, and it is clear from the record that the concept of "assumption of risk" was central to the discussion between court and counsel on whether instructions on both voluntary or involuntary intoxication should be given.[1]

The challenged language was criticized in *Mathson, supra*, 210 Cal.App.4th 1297, and defendant adopts that criticism here. In *Mathson*, the court observed as an aside that the voluntary intoxication instruction did not "mirror" the involuntary intoxication instruction with respect to the forseeability of a drug's intoxicating effect. (*Id*. at pp. 1327–1328, fn. 31.) "Logically . . . , a person who does not know, but reasonably should have known of the intoxicating effects is voluntarily intoxicated. Yet, this was not expressly stated in the voluntary intoxication instruction." (*Ibid.*) It further noted: "CALCRIM No. 3426, voluntary intoxication, states two ways a person can be voluntarily intoxicated—'knowing that [the drug] could produce an intoxicating effect, *or willingly assuming the risk of that effect*.' (Italics added.) We take no position here about the assumption of the risk language as an alternative to actual knowledge of the intoxicating effects in cases not involving prescription drug intoxication. Although the genesis of that language is hard to pinpoint [citation], the language was long ago

---

[1] Defendant has not challenged as error the trial court's refusal to instruct on involuntary intoxication as a defense to reckless driving.

13

approved [citations].  However, where the defendant asserts a defense based on the unexpected effect of prescription drugs, we are of the view that the assumption of the risk language does not adequately focus the jury on the question of forseeability."  (*Id.* at p. 1328, fn. 32.)  The *Mathson* court went on to recommend that the Judicial Council adopt the " 'knew or reasonably should have known' " formulation for voluntary intoxication instructions to be used in cases where the defense involves a claim of unconsciousness resulting from the unexpected effect of prescription drugs.  (*Ibid.*)[2]

The drafters of CALCRIM No. 3426 have not taken up the *Mathson* court's recommendation.[3]  The Bench Notes include a citation to *Mendoza, supra*, 18 Cal.4th 1114, 1127–1128 and other cases for the proposition that voluntary intoxication may not be considered for general intent crimes.  (2 Judicial Council of Cal., Jury Instns. (2013) Bench Notes to CALCRIM No. 3426, p. 920.)  *Mendoza* reiterates the long-held view in California that "the 'distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender.  That problem is to reconcile two competing theories of what is just in the treatment of those who commit crimes while intoxicated.  On the one hand, the moral culpability of a drunken criminal is frequently less than that of a sober person effecting a like injury.  On the other hand, it is commonly felt that a person who voluntarily gets drunk and while in that state commits a crime

---

[2] Although the defendant in *Mathson* did not complain about "the court's failure to include 'reasonably should have known' language in the voluntary intoxication instruction as error," the *Mathson* court concluded "the trial court's failure to include this mirror image language in the voluntary intoxication instruction was harmless" because the instructions as a whole were "adequate."  (*Mathson, supra*, 210 Cal.App.4th at pp. 1327–1328, fn. 31.)

[3] We note the Judicial Council also has not changed the "assumption of risk" language in CALCRIM No. 626 (Voluntary Intoxication Causing Unconsciousness: Effects on Homicide Crimes), which reads in relevant part:  "A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or *willingly assuming the risk of that effect*. [¶] When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that while unconscious he or she will commit acts inherently dangerous to human life."  (Italics added.)

should not escape the consequences.' [Citation.] Thus, courts came to distinguish 'between so-called specific intent and general intent crimes,' with intoxication relevant to the former but not the latter." (*Mendoza,* at p. 1127, quoting from *People v. Hood* (1969) 1 Cal.3d 444, 455–456 [superseded by amendments to Pen. Code, former § 22 on a different point].) Put differently, "criminal responsibility in a general intent crime is justified where a defendant is voluntarily intoxicated to the point of unconsciousness even though there was no actual intent to commit a crime because a defendant may not avoid the criminal harm caused by his or her failure to act 'with reason and conscience.' [Citation.] Criminal responsibility in this context is predicated on a theory of criminal negligence." (*Mathson, supra*, 210 Cal.App.4th at p. 1326, citing *People v. Velez*, *supra,* 175 Cal.App.3d at p. 794.)

In our view, the "assumption of risk" language conveys not only the concept of forseeability but also the idea of criminal negligence as a baseline for criminal culpability, without cluttering up the instruction with explanations of criminal intent and negligence. We see no reasonable likelihood that the "assumption of risk" language in CALCRIM No. 3426 encourages jurors to base a voluntary intoxication finding on their own "moral, social, or emotional disapproval or opposition to" a particular activity or drug. Taken as whole, the instruction squarely places on the prosecution the burden to prove beyond a reasonable doubt that the defendant was conscious when he acted, and adequately conveys that a person is voluntarily intoxicated if he or she knew or should have known of the potentially intoxicating effect of a drug voluntarily ingested by him or her. We find no error.

### C. *CALCRIM No. 250—Union of Act and Intent*

Defendant argues: "The court erroneously instructed that the only intent required for conviction was of general intent—i.e., intentionally doing a prohibited act." Defendant did not object to this instruction below. Nor did he object to the voluntary intoxication instruction on the ground that reckless driving is not a general intent crime. On appeal, he fails to cite any case holding that reckless driving is a specific intent crime, nor have we found any. Vehicle Code section 23103, subdivision (a) defines reckless

15

driving as the act of "driv[ing] a vehicle upon a highway in a willful or wanton disregard for the safety of persons or property." This definition also informs Vehicle Code sections 23104 and 23105, the crimes with which defendant was charged.

The court instructed in pertinent part as follows:

"The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent or mental state. The instruction for each crime explains the intent and/or mental state required." (CALCRIM No. 225 [Circumstantial Evidence: Intent or Mental State].)

"The crimes charged in this case require proof of the union, or joint operation, of act and wrongful intent. For you to find a person guilty of the crimes in this—guilty of the crimes of reckless driving with [specified] injury, Counts One and Two, or reckless driving with bodily injury, Counts Three through Six, that person must not only commit the prohibited act but must also do so with wrongful intent. [¶] *A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime*." (CALCRIM No. 250, italics added.)

"The defendant is charged in Count One with reckless driving causing specific injury to LaRae Kaarup . . . . To prove that the defendant is guilty of this crime the People must prove that (1) the defendant drove on the highway, (2) the defendant intentionally drove with wanton disregard for the safety of persons or property, and (3) the defendant's reckless driving proximately caused a bone fracture. [¶] A person acts with wanton disregard for safety when (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of harm, and (2) he or she intentionally ignores that risk. The person does not, however, have to intend to cause damage." The court gave the same instruction with regard to Keith Kaarup, for count two, and substantially similar instructions, with the same definition of wanton disregard, for counts three through six.

A general intent crime is one where " 'the definition of [the] crime consists of *only* the description of a particular act, without reference to intent to do a further act or

16

achieve a future consequence.' " (*People v. Whitfield* (1994) 7 Cal.4th 437, 449, superseded by statute as stated in *Mendoza, supra,* 18 Cal.4th 1114, 1126, italics added.) In a general intent crime, the question is " 'whether the defendant intended to do the proscribed act' " and " '[t]his intention is deemed to be a general criminal intent.' " (*People v. Whitfield,* at p. 449.) By this definition, reckless driving is a general intent crime, insofar as driving with a "wanton disregard for safety" does not reference an intent to do a further act or achieve a future consequence.

However, "[s]ometimes, even this definition is inadequate." (*Mendoza, supra*, 18 Cal.4th at p. 1127.) For that reason, our Supreme Court has repeatedly "cautioned against the rote application of the general/specific intent framework. We have also suggested that '[s]uch classification of offenses is necessary "only when the court must determine whether a defense of voluntary intoxication or mental disease, defect, or disorder is available . . . ." ' " (*People v. Williams* (2001) 26 Cal.4th 779, 785), an issue which is not raised in this appeal.

The gist of defendant's complaint here is that the court's instructions were "conflicting," and jury misunderstanding was reasonably likely because "[t]he instructions on mental state as a whole were complicated." We disagree. As we see it, the court's instructions were complementary. CALCRIM No. 225 told the jury the prosecution had to prove defendant did the acts with a particular intent or mental state, and that the instructions for each crime would explain the intent or mental state required. CALCRIM No. 250 reiterated that the crimes consisted of two parts, a prohibited act and a wrongful intent. To be sure, in this instruction the court did not say the wrongful intent was wanton disregard for the safety of persons or property. It said "[a] person acts with wrongful intent when he or she intentionally does a prohibited act," and told the jury the act would be explained "in the instruction for that crime." The instructions on the charged crimes described the prohibited act as *intentionally* driving on a highway *with* wanton disregard for the safety of persons or property. There is no reasonable likelihood the jury could have been confused by these instructions, taken together as a whole, so as to think it could find defendant guilty without first finding he acted with wanton

17

disregard.  CALCRIM No. 251, the alternative instruction recommended for specific intent crimes, makes the identification of the particular specific intent at issue an optional add-on.[4]  It does not otherwise add any clarity to that which is already made obvious by CALCRIM Nos. 250 and 251.  We find no error.

**D.  *CALCRIM No. 316—Witness Credibility***

The trial court instructed the jury with CALCRIM No. 316 as follows:  "If you find that a witness has committed a crime or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony.  The fact that a witness may have committed a crime or other misconduct does not necessarily destroy or impair a witness's credibility.  It is up to you to decide the weight of that fact and whether that fact makes the witness less believable. [¶] During the trial certain evidence was admitted for a limited purpose.  You may consider that evidence only for that purpose and for no other."

In discussion with counsel, the court indicated it was referring to defendant's testimony he abused drugs intravenously.  Counsel stated in response:  "That he took his prescription medication and got high with it.  Okay, yeah.  Okay."  Defendant also admitted a shoplifting arrest.

Assuming defendant's acquiescence did not waive appellate review of the contention (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1133–1134), and further assuming recreational drug use and shoplifting arrests do not involve moral turpitude (*People v. Contreras* (2013) 58 Cal.4th 123, 157–158 & fn. 24), any assumed error was harmless.  The evidence was admitted without objection or limitation.  The court's

---

[4]  CALCRIM No. 251 provides in relevant part:  "The crime[s] [(and/or) other allegation[s]] charged in this case require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crime[s] [in this case], that person must not only intentionally commit the prohibited act . . . , but must do so with a specific [intent and/or mental state].  The act and the specific [intent and/or mental state] required are explained in the instruction for that crime [or allegation]. [¶ ] . . . [¶] [The specific (intent/ [and/or] mental state) required for the crime of _____ *<insert name[s] of alleged offense[s] e.g., burglary>* is _____ *<insert specific intent>*.]"

18

instruction prevented the jury from considering it to show propensity to abuse drugs or bad character. In the grand scheme of things, defendant's admission of past recreational use of OxyContin, and of an equally remote arrest for shoplifting, was a minor part of the trial, which focused primarily on the conflicting testimony of two experts on the phenomenon of sleepwalking. These admissions were not made an issue in closing argument. In our view, there is no reasonable probability the result would have been different if the court had refrained from giving the challenged instruction. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Inasmuch as we have found no errors other than assumed ones, we also reject defendant's argument that the cumulative prejudice from a series of trial errors requires reversal of his convictions. (*People v. Hill* (1998) 17 Cal.4th 800, 844.)

## V. DISPOSITION

The judgment is affirmed.


_____
Dondero, J.


We concur:


_____
Margulies, Acting P.J.


_____
Banke, J.

19