Filed 6/16/26  P. v. Spejcher CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>BRYN P. SPEJCHER,<br><br>     Defendant and Appellant. | 2d Crim. No. B335839<br>(Super. Ct. No. 2018018798)<br>(Ventura County) |

Appellant Bryn P. Spejcher challenges her conviction of involuntary manslaughter by an unlawful act (Penal Code § 192, subdivision (b)) contending there was insufficient evidence, improper exclusion of evidence, numerous instructional errors, and double jeopardy.  We conclude her contentions are meritless and will affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Appellant and Chad O'Melia were "hanging out" at his condo when he decided to smoke his bong outside.  Appellant joined O'Melia on the patio and watched him smoke from the bong.  She asked, "Can I have a hit?"  O'Melia prepared the bong

and told appellant to inhale. She felt a burning and coughing sensation. O'Melia took another hit, and they continued chatting. O'Melia said he felt "really high" and appellant said she "wasn't feeling anything." O'Melia was surprised and started preparing the bong again. When it was ready, O'Melia rushed the bong to appellant's face and said, "hurry up, hurry up, you gotta inhale." She knew it was a lot stronger because of the amount of smoke inside the bong. She "felt like [she] couldn't say no" and inhaled the smoke. The burning was intense. She stumbled to the bathroom coughing, trying to vomit the puff of air stuck in her throat. She was crying, could not stop coughing, and water was not helping. She laid down on the living room couch because she was afraid of falling. O'Melia was laughing, making fun of her, kissing her, and "shoving or pouring" water in her mouth. Appellant tried to speak but she was not forming logical words. O'Melia told her to close her eyes and go to sleep. Instead of sleeping, appellant began having visions. She saw her dead body and heard voices saying she could come back to life.

O'Melia's roommate Vinnie DeOliveira heard a loud sound coming from downstairs. He heard yelling, including the words "Get off me," and the sound of things breaking. He headed downstairs and saw O'Melia with his hands on his bleeding chest, and appellant holding a knife. O'Melia said, "Help me, Vinnie. She stabbed me. Call 911." Appellant did not make eye contact with DeOliveira. She looked angry and she was yelling and looking straight at O'Melia.

DeOliveira ran upstairs to grab his phone to call the police and headed downstairs again. He saw O'Melia fall to the ground holding his chest. Appellant got on top of him, yelling, crying, and stabbing him. DeOliveira was afraid, so he ran outside and

2

called 911. When police arrived, O'Melia was dead and appellant was on her knees, stabbing herself in the neck.

An officer tased appellant with 50,000 volts for five seconds, but appellant kept stabbing herself. The officer tased appellant two more times and she continued stabbing herself. He then struck appellant with his steel baton, to no effect. After nine baton strikes, appellant finally dropped the knife. Appellant was arrested and transported to the hospital where she underwent emergency surgery.

An autopsy revealed O'Melia suffered 108 sharp-force injuries inflicted by four different knives. He was stabbed in the trachea, carotid artery, jugular vein, heart, both lungs, liver, chest, back, shoulder, and head. He had marijuana in his system, but no synthetic drugs or alcohol.

Testing revealed the marijuana in O'Melia's home was 4.1 percent Delta-9 THC (tetrahydrocannabinolic acid), a mid-level strength, with no other illicit substances. It is impossible to confirm the substance tested was what appellant smoked.

A forensic scientist testified THC produces a euphoric, relaxing feeling, but some individuals experience hallucinations, increased anxiety, paranoia, and even psychosis. THC affects inexperienced users more than habitual users. The effect of smoking marijuana is instant, and peaks 10 to 30 minutes after use. Over time, the measurable amount of THC detectable in blood does not accurately reflect what is affecting an individual's brain. When appellant's blood was tested at the hospital, it indicated recent marijuana use, no other substances, and that she was an infrequent user.

A board-certified forensic psychologist testified that appellant experienced a level four (highest level) cannabis-induced psychotic break with hallucinations and major

3

misperceptions of reality which caused her to take a life and harm herself.

In an amended single-count information filed by the Ventura County District Attorney's Office, appellant was charged with involuntary manslaughter by an unlawful act, in violation of Penal Code[1] section 192, subdivision (b). It was alleged appellant personally used a deadly and dangerous weapon. (§ 12022, subd. (b)(1).) It was further alleged the crime was a serious felony in which appellant personally inflicted great bodily injury (§ 1192.7, subd. (c)(8)), the crime involved great violence, great bodily harm, threat of great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness (Cal. Rules of Court, rule 4.421(a)(1)); appellant engaged in violent conduct indicating a serious danger to society (*id*., rule 4.421(b)(1)); and appellant was armed with and used a weapon during the commission of the crime (*id*., rule 4.421(a)(2)). Appellant pleaded not guilty and denied the special allegations.

A jury found appellant guilty of involuntary manslaughter by an unlawful act (§ 192, subd. (b)). Appellant waived her jury trial right regarding the special allegations. The trial court initially found the weapon allegation (§ 12022, subd. (b)(1)) not true but later revisited the ruling and found the allegation true. (§ 12022, subd. (b)(1).)

The trial court exercised its discretion and struck the weapon enhancement and the California Rules of Court, rule 4.421(a)(1), (a)(2), and (b)(1) allegations. Imposition of sentence was suspended, and the court released appellant on formal probation for 24 months with several conditions, including paying

---

[1] Further undesignated statutory references are to the Penal Code.

victim restitution.  The trial court later modified appellant's probation, extending it to January 23, 2027.

DISCUSSION

*Sufficient Evidence Supports Involuntary Manslaughter*

Appellant asserts her conviction of involuntary manslaughter must be reversed because insufficient evidence proved she had criminal intent.  She argues it would have been unreasonable to predict this outcome from smoking two "hits" of marijuana.  We conclude substantial evidence supports a reasonable jury finding appellant voluntarily and willingly consumed more marijuana than she ever had, with someone she had only recently met, without taking any precautions at all, and her negligence in self-intoxicating to the point of unconsciousness was criminal.

"'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.'" (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  We do not focus on "'"isolated bits of evidence."'" (*People v. Cuevas* (1995) 12 Cal.4th 252, 261.)  We examine the entire record and draw all reasonable inferences in favor of the judgment to determine whether there is reasonable and credible evidence from which a rational trier of fact could find defendant guilty beyond a reasonable doubt. (*People v. Streeter* (2012) 54 Cal.4th 205, 241.)

Involuntary manslaughter occurs during the "commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b).)  The mental state required for involuntary manslaughter is criminal negligence. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007.)

5

"'Unconsciousness, if not induced by voluntary intoxication, is a complete defense to a criminal charge.' [Citations.]" (*People v. Nieves* (2021) 11 Cal.5th 404, 463.) "However, '[w]hen a person renders [themselves] unconscious through voluntary intoxication and kills in that state, the killing is attributed to [their] negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' [Citations.]" (*Ibid.*)

"[W]hether intoxication is voluntary or involuntary focuses on whether . . . the defendant knows or has reason to anticipate the intoxicating effects of the substance [they] ingest[].  If . . . the defendant knows or has reason to anticipate the intoxicating effects, the intoxication is voluntary." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1313.)  "Voluntary intoxication is not a defense to assault with a deadly weapon." (*People v. Rocha* (1971) 3 Cal.3d 893, 896 (*Rocha*).)  It is for the factfinder to determine whether unconsciousness is voluntary or involuntary when it results from ingestion of a lawful substance one knew was intoxicating but failed to anticipate the degree of intoxication possible.

Appellant was convicted of involuntary manslaughter occurring during the commission of an assault with a deadly weapon.  She asserts insufficient evidence proved she was voluntarily intoxicated or that she committed an assault with a deadly weapon because she did not attack O'Melia with a knife "willfully" "aware of facts."  She asserts she was not voluntarily intoxicated because "a reasonable person would not have known two hits of marijuana would result in unconsciousness."  She claims O'Melia prepared the marijuana in such a manner (e.g., by using marijuana with the highest level of THC and adding "wax" (a concentrated form of marijuana) that he "administered a toxic dose to appellant."  She argues under these circumstances "she

6

did not knowingly or voluntarily ingest a toxic level of marijuana" and therefore could not have been criminally negligent.

Appellant also contends she was involuntarily intoxicated due to duress since she only smoked the second hit because she feared O'Melia's violent temper and he "made her." She testified she felt pressured, like she couldn't say no, because she was "actually kind of scared" and felt intimidated by O'Melia.

These are the same arguments appellant made to the jury. The jury was free to, and did, disagree. We will not reweigh evidence or reassess witness credibility. (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) There was sufficient evidence for a rational jury to reasonably infer it was appellant's desire and voluntary decision to smoke from the bong both times that night, that she knew or had reason to anticipate marijuana's intoxicating effects, and therefore she assumed the risk she would become intoxicated to the point of unconsciousness.

We disagree with the dissent's characterization of what occurred. Appellant's trial testimony evidenced she was aware marijuana is an intoxicant. She had previously used marijuana, "felt high" and then "passed out" after using it. She was aware marijuana is available in different potencies because she had visited a dispensary, spoken to a salesperson about potencies, and purchased "ten percent" marijuana. She was aware additives are available because she and her friends texted about adding marijuana oil to their ice cream to get high. She knew O'Melia about a month, she had seen him use marijuana several times, and she had previously smoked from his bong with him. That night she watched him smoke from his bong and asked for a hit. When she told him she "wasn't feeling anything" after the first hit, he said, "Let's make this really intense or really fucked up for you."

7

At that point, appellant could have declined, inquired about the potency, or asked whether he added anything to the marijuana in the bong. Instead, she watched O'Melia prepare the bong for her second hit. She thought he put a lot more marijuana in it. She watched him pull "as much smoke as he could in the bong" and she knew it "was a lot stronger just because of the amount of smoke." She admits she had no control over what was in the bong, yet she inhaled more than she ever had anyway. This was criminal negligence and would have subjected her to conviction for any crime committed while she was unconscious. It is a tragedy the crime resulted in O'Melia's death.

We also disagree with the dissent describing appellant as becoming instantaneously unconscious from "two hits" of marijuana. The record is not clear how much time passed between appellant smoking the second time and stabbing O'Melia, and evidence demonstrates appellant's "two hits" was actually multiple doses of marijuana.

Appellant testified that after she took the second hit, she went to the restroom to vomit but it did not help. She wanted her inhaler. She could not stop choking and vomiting, and it felt like O'Melia had been gone for a while. She described looking at herself in the mirror and the room spinning, then stumbling to the living room to lay on the couch. She remembers having a conversation with O'Melia while she lay on the couch, but he was laughing at her and she could not form logical words. She felt like hours went by as she lay on the couch. She said O'Melia kept coming over to talk to her and then he would walk away. At some point, she believed she was dead and began hearing people talking over her. She then began to see "two hands grab two of the knives and turn towards" O'Melia. These facts do not demonstrate "instantaneous unconsciousness."

Marijuana is classified as a hallucinogen in California. (Health & Saf. Code § 11054, subd. (d)(13).) According to expert witness testimony, marijuana induced psychosis is a known phenomenon. Marijuana is "more potent than it's ever been." In the last few decades, the marijuana industry has genetically modified the plants "to produce higher levels of THC." In the '70s and '80s, marijuana "was around two to five" percent, with high potency marijuana being "ten percent." Today, marijuana potency has increased by 75 percent and is available in "85-plus percent."

Experts testified that in terms of variables affecting one's reaction to marijuana, it is not just the potency, but the amount of smoke inhaled. An expert testified a bong is the fastest and most potent way to deliver marijuana to your system and by pulling as much smoke as possible into the chamber, the user pulls more doses into the chamber. The jury could have concluded that when appellant inhaled as much of the bong smoke as she could, she was not just taking a "second hit." She was taking multiple hits. Thus, the jury could have reasonably concluded she did not become psychotic after "two hits" of marijuana, but after smoking as much marijuana as she could at once.

"[The jury] did not have to accept at face value that [appellant] did not have reason to anticipate the intoxicating effect of the drug she took." (*People v. Chaffey* (1994) 25 Cal.App.4th 852, 857.) "Although the trier of fact could have found [appellant's] intoxication was not voluntary, such a finding was not compelled." (*Id.*, at p. 858.) Even if unconsciousness was not "predictable or necessarily foreseeable from her past experience" with marijuana, the jury could have concluded she knew something different and possibly more extreme than she

9

had ever experienced could occur to her consciousness. (*Id.*, at p. 857.) That appellant might have been an inexperienced or naive marijuana user, with a low tolerance for marijuana's effects, and had rarely felt its intoxicating effect is no excuse. (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1326-1327 [unconsciousness defense did not apply to "sleep driving" after voluntary Ambien intoxication].)

We would reach this conclusion even if appellant had harmed another while unconscious in a less gruesome manner and regardless of appellant's profession. "'It is a duty which every one owes to his fellow-men, and to society . . . to preserve, so far as lies in his power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable. But if, by a voluntary act, he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which, in that state, he may do to others or to society.'" (*People v. Blake* (1884) 65 Cal. 275, 277 quoting *People v. Rogers* (1858) 18 N.Y. 9; *People v. Velez* (1985) 175 Cal.App.3d 785, 794.) Whether the evidence and testimony could have resulted in a contrary finding "does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

*Exclusion of Victim Character Evidence*

Appellant contends the court abused its discretion by excluding evidence O'Melia choked appellant twice during sex and nearly came to blows with someone at a dog park. She claims the evidence was relevant to show she was coerced to take the second hit, proving she was involuntarily intoxicated. We review evidentiary rulings for abuse of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

10

Prior to trial, the prosecution moved to exclude evidence of O'Melia's character, noting it was aware of three possible instances of his aggressive behavior. The prosecution argued that admitting these prior acts was neither probative nor relevant, but extremely prejudicial and should be excluded under Evidence Code section 352. Appellant opposed the motion, arguing the motion should be denied because she planned to argue intoxication was caused by trickery or fraud. She did not address duress or inclusion or exclusion of O'Melia's character evidence. The trial court granted the prosecution's motion. When asked for comments on the decision, defense counsel stated, "We agree."

On the seventh day of trial, two days into the defense's case in chief, defense counsel indicated they sought to prove appellant was involuntarily intoxicated due to duress by questioning appellant regarding O'Melia's propensity for violence. Over defense's objection, the trial court repeated its pretrial ruling, finding the line of questioning would be an unwarranted use of time and more prejudicial than probative. The court also stated the ruling was in part because the prosecution had now been deprived of the opportunity to present the evidence themselves or to voir dire the jury pool for sensitivity to questions of choking during sex.

It is appellant's burden to show ""'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner'"" resulting in a manifest miscarriage of justice. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.) We conclude appellant has not met her burden.

*Instructional Error as to CALCRIM No. 3425*

Appellant contends her conviction must be reversed because the involuntary intoxication jury instruction (CALCRIM

11

No. 3425) omitted "key language" regarding the prosecution's burden to prove beyond a reasonable doubt that appellant was conscious when she stabbed O'Melia.

We review de novo whether jury instructions are correct, consider the instructions as a whole, and examine whether the instructions fully and fairly instructed the jury on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

The standard version of CALCRIM No. 3425 includes the following paragraph:

"The People must prove beyond a reasonable doubt that the defendant was conscious when (he/she) acted. If there is proof beyond a reasonable doubt that the defendant acted as if (he/she) were conscious, you should conclude that (he/she) was conscious, unless based on all the evidence, you have a reasonable doubt that (he/she) was conscious, in which case you must find (him/her) not guilty." (CALCRIM No. 3425.)

Appellant contends omitting this language improperly lowered the prosecution's burden to prove she was conscious when she stabbed O'Melia. But her claim fails because her consciousness was not disputed. The prosecution, defense, and expert witnesses agreed appellant was unconscious when she stabbed O'Melia. The question was whether her unconsciousness was caused by voluntary or involuntary intoxication. Giving the standard version of CALCRIM No. 3425 would likely have confused the jury into thinking they must decide an undisputed issue. Omitting the paragraph was proper.

*Instructional Error as to CALCRIM No. 875*

Appellant contends CALCRIM No. 875 was an incorrect statement of law because it stated voluntary intoxication is not a defense to assault with a deadly weapon. Her argument focuses on the jury determining whether the prosecution proved she was

12

conscious when she stabbed O'Melia. Again, appellant's consciousness was not an issue for the jury's determination because all parties agreed she was unconscious when she acted.

Assault with a deadly weapon is a general intent crime. (*Rocha*, *supra*, 3 Cal.3d at pp. 898-899.) Unconsciousness due to voluntary intoxication is not a defense to a general intent crime. (§ 29.4.) CALCRIM No. 875 was a correct statement of law.

*Pinpoint Instruction Regarding Duress*

Appellant contends we must reverse because the trial court failed to instruct the jury on an appropriate pinpoint instruction for duress. We disagree.

Trial courts are not required to give pinpoint instructions sua sponte. (*People v. Rivera* (2019) 7 Cal.5th 306, 328-329.) "'[A] trial judge must only give those instructions which are supported by substantial evidence,' and 'has the authority to refuse requested instructions on a defense theory for which there is no supporting evidence.'" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 823.) Appellant's failure to request a pinpoint instruction on duress forfeits her claim on appeal. (*People v. Jones* (2014) 223 Cal.App.4th 995, 1001.)

*Trial Court's Response to Jury Question*

Appellant contends we must reverse because the court's response to a jury question was incorrect. We review a court's decision "to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury" for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)

During deliberations, the jury asked what the word "such" meant in the context of CALCRIM No. 3425 as given to the jury, which stated in relevant part, "In determining whether the defendant's intoxication was voluntary or involuntary, consider whether a reasonable person, under the same circumstances,

13

would know or have reason to anticipate that this substance could cause such intoxicating effects." The prosecution argued the word "such" leads to confusion, but defense counsel argued, "Your Honor, my view is that the meaning of the word 'such' would have to be determined by the jury. So the response should be, 'Your consideration of the meaning of the word "such" is for the jury to decide.'" The court suggested responding, "'Please see Instruction 200'[2] . . . 'Words not defined in these particular instructions are to be defined using their everyday ordinary meanings.'" Defense counsel replied, "Your Honor, I would embrace the suggestion that you just made. . . . I think that's the right response." Defense reiterated twice more that they agreed with the instruction, even calling it "Perfect."

There is no abuse of discretion when a trial court determines "the best way to aid the jury is by directing the jury to reread the applicable jury instructions." (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1017.) But even if there was, defense counsel's "affirmative agreement with the court's reply" to the jury's note forfeits any claim of error. (*People v. Salazar* (2016) 63 Cal.4th 214, 248.)

---

[2] The relevant paragraph in CALCRIM No. 200 states, "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."

*Double Jeopardy Claim*

Appellant contends double jeopardy barred a true finding on the knife-use enhancement because the court's initial not true finding was an express acquittal precluding reconsideration on that allegation. We review this claim de novo. (*People v. Sanchez* (2020) 49 Cal.App.5th 961, 975-976.)

In a bifurcated court trial, the court found the personal knife-use allegation under section 12022, subdivision (b)(1)[3] not true "[n]ot because a deadly weapon was not used" but because it believed it was an element of the assault with a deadly weapon charge (§ 245, subd. (a)(1)) included in the involuntary manslaughter charge in count 1.[4] The prosecution then filed a

_____

[3] Section 12022, subd. (b)(1) states: "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."

[4] Count 1 in the amended information alleged: "On or about May 28, 2018, in the above named Judicial District, the crime of INVOLUNTARY MANSLAUGHTER BY AN UNLAWFUL ACT, in violation of Penal Code 192(b), a Felony, was committed by BRYN P SPEJCHER, who did unlawfully kill a human being, to wit, Chad O'Melia, with criminal negligence, but without malice, as a proximate result of the commission by defendant of an unlawful act, to wit, a violation of Section 245(a)(1) of the Penal Code." Section 245(a)(1) states: "Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a

15

written motion (excluded from the record) to revisit the court's prior ruling as to the special allegation in count 1.  The court granted the motion, found the enhancement true, and then struck it.

Appellant has not cited any relevant case law supporting her position and we have found none.  Section 12022 is a sentence enhancement imposing "an additional and consecutive" prison term for anyone "who personally uses a deadly or dangerous weapon in the commission of a felony."  (§ 12022, subd. (b)(1); *People v. Bland* (1995) 10 Cal.4th 991, 995.)  Appellant was not put in jeopardy twice when the court reconsidered whether the knife-use enhancement was true because it "was a sentencing determination to which double jeopardy protections do not apply." (*People v. Hernandez* (1998) 19 Cal.4th 835, 842.)

DISPOSITION

Judgment is affirmed.

NOT TO BE PUBLISHED.

CODY, J.

I concur:

BALTODANO, J.

---

fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment."

16

YEGAN, J., dissenting:

I respectfully dissent. Unlike most criminal appeals that deal with procedural issues, this appeal is somewhat unique. It deals with guilt or innocence. In my opinion, appellant should not have been convicted of involuntary manslaughter. The judgment should be reversed and the case should be dismissed.

It is extremely sad, tragic, and unfortunate that the victim was stabbed over one hundred times which lead to his death. Nevertheless, it remains the rule that for a crime to be committed in California, there must be a joint operation of criminal conduct and criminal intent. Here, there was no criminal intent at the time of the stabbings. There may be an exception in the context of involuntary manslaughter where, in a typical case, the defendant voluntarily abuses intoxicants and is therefor, "deemed" to be acting with "criminal negligence." (See *People v. Ochoa* (1998) 19 Cal.4th 353, 423: see also *People v. Nieves* (2021) 11 Cal.5th 404, 463.)

This is not a typical case. (See *People v. Triggs* (1973) 8 Cal.3d 884 [The California Supreme Court's ". . . statement of law remain binding on the trial and appellate courts of this state . . . and must be applied wherever the facts of a case are not fairly distinguishable from the facts of the case in which we have declared the applicable principle of law].) The *Ochoa* rule does not contemplate that "voluntary" smoking of two "hits" of marijuana will lead to almost immediate unconsciousness. The People were required to prove appellant had a mind-set of "criminal negligence" as a condition of this involuntary manslaughter conviction.

I am cognizant of the time-honored rules on appeal. I nevertheless conclude that the evidence is insufficient as a matter of law to support the jury's verdict. The facts and

circumstances are sui generis.  I have never seen a case even remotely similar to the instant case.

Both the People and appellant agree that appellant was unconscious when she repeatedly stabbed the victim to death.  She was also unconscious when she repeatedly tried to kill her service dog by stabbing him.[5]  She was also unconscious when she repeatedly attempted to commit suicide by stabbing herself in the neck.  The responding police officer was unable to curtail this attempt at suicide with a 50,000 volt taser administered for five seconds.  She only stopped stabbing herself after being struck with a metal police baton 9 times.  The responding officer saved her life.  She recovered after surgery, was unaware of what she had done, and was then charged with crime relating to the death of the victim.

Appellant and the victim were in a romantic relationship.  She had smoked marijuana with the victim before.  It was lawful for the victim and appellant to smoke marijuana.  There was no reason, whatsoever, for her to believe that two "hits" of marijuana would render her immediately incapacitated and unconscious.  To be sure, she voluntarily smoked the marijuana with the intention of having an intoxicating marijuana effect.  But she did not voluntarily become intoxicated on marijuana.  Instead, almost immediately, she became unconscious.  She was, in essence, poisoned.  She did not agree to be poisoned.  She did not agree to smoke the marijuana to render herself unconscious.  It is unreasonable as a matter of law that such a person would foresee unconsciousness.  A psychiatrist and a clinical

---

[5] Appellant has been hearing impaired from an early age and has a service dog to assist her because of this disability.

2

pharmacologist/toxicologist both testified that it would be unreasonable for appellant to predict this outcome on two "hits" of marijuana.

"Criminal negligence is "'aggravated, culpable, gross, or reckless . . . conduct . . . [that is] such a departure from what would be the conduct of an ordinary prudent or careful [person] under the same circumstances as to be incompatible with proper regard for human life . . . ." ' [Citation.]" (*People v. Valdez* (2002) 27 Cal.4th 778, 783.)  Even if appellant knew that the second "hit" was dramatically stronger than the first "hit", she did not have a mind-set of criminal negligence as defined by the California Supreme Court.  The objective reader is asked:  was her conduct "aggravated?"  Was her conduct "culpable?"  Was her conduct "reckless?"  Was her conduct "incompatible with proper regard for human life?"  The answer to these questions is, "No."

If the majority opinion is correct, the "criminal negligence" standard has morphed into a strict liability standard.  That is to say, nearly instantaneous unconsciousness caused by two "hits" of marijuana is "deemed" to be "voluntary intoxication," and therefore, "criminal negligence."  This is at variance with basic principles of criminal law.  It is also at variance with common sense.  A conviction of involuntary manslaughter should not be based on involuntary unconsciousness.

 A law-abiding person with no criminal record has no intention of killing her boyfriend, her service dog, or herself by taking two "hits" of marijuana.  The judgment should be reversed and the case should be dismissed.

NOT TO BE PUBLISHED.


YEGAN, A.P.J.


3

David Worley, Judge
Superior Court County of Ventura

_____

Sally Patrone, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and Susan S. Kim, Deputy Attorney General, for Plaintiff and Respondent.